W. P. PERKINS v. THE TERRITORY OF OKLAHOMA.

(Filed Sept. 5, 1900.)

1. RULING OF THE TRIAL COURT IN REJECTING OR ADMITTING EVI-
DENCE. When the ruling of the trial court is upon matters rest-
ing within his discretion, and when the ruling calls for the exer-
cise of sound discretion on the part of the trial judge, this court
will not disturb the findings, unless it is apparent from the record
that there has been a clear abuse of discretion.

2. INDICTMENT. If the charge in the indictment is substantially in the
language of the statute it is sufficient, and the language used
should receive its common and ordinarily accepted meaning.

(Syllabus by the Court.)

*Error from the District Court of Pottawatomie County; be-
fore B. F. Burwell, District Judge.*

*G. A. Outcelt, L. G. Pitman,* and *B. B. Blakeney,*   for
plaintiff in error.

*J. C. Strang, Attorney-General,* and *Keaton & Kearful,*
for defendant in error.

STATEMENT OF THE CASE

The plaintiff in error was indicted in the district court
of Pottawatomie county on the 11th day of April, 1898,
charged with the murder of one John Blackwell, in Pot-
tawatomie county, on February 22, 1898. The plaintiff
was arraigned on the 12th day of April, 1898, and he filed
his demurrer thereto on April 5, 1899, and same was by
the court overruled, and the plaintiff at the time ex-
cepted, and the court set the case down for trial on May

11, 1899. On May 12, 1899, plaintiff filed his motion for a continuance for the term on account of the absence of testimony and the court overruled said application for a continuance for the term, but postponed the trial of same until May 18, 1899. On the 18th day of May, 1899, the case was called for trial, and over the objection of plaintiff the court placed the plaintiff on trial. That the jury was examined and sworn, and the court discovering that the plaintiff had not pleaded to the indictment, ordered a plea entered of not guilty, and had the jury resworn, overruled the plaintiff's second motion for a continuance, to which plaintiff excepted, and on May 27, 1899, the jury returned their verdict, finding the plaintiff guilty of manslaughter in the second degree. On August 1, 1899, the court overruled the plaintiff's motion for a new trial, to which plaintiff excepted, and sentenced the plaintiff to imprisonment in the Territorial prison for a period of three years. The defendant below, plaintiff here, has appealed to this court.

Opinion of the court by

IRWIN, J.: The first contention of plaintiff in error is that the court erred in putting the defendant on trial for the crime of murder, for the reason that the indictment did not charge murder under the statutes of Oklahoma, and that the court erred in excusing jurors on account of conscientious scruples against capital punishment, and in overruling defendant's motion for a new trial on the grounds stated above. And in support of this position the counsel for plaintiff in error cite the court to the case of *Jewell v. The Territory of Oklahoma*, 4 Oklahoma, 53, and *Holt v. The Territory*, 4 Oklahoma, 76, and a number of other authorities. We think an ex-

amination of these cases will show that they are not analogous to the case at bar, and that the language used, or the meaning expressed in the indictments in those cases, are in no way similar to the indictment in the case under consideration. In the Jewell case the conviction was had under the first count of the indictment, and the remarks of the court are confined to that count; and in passing we would say that had the verdict been a general, one of guilty, instead of "guilty as charged in the first count of the indictment," the decision of the supreme court would in our judgment have been different, as we are strongly of the opinion that in the Jewell case the third conut of the indictment contains a sufficient charge or murder under our statute, but, as the verdict of the jury was based upon the first count, and the reasoning of the supreme court in that case was confined to the first count, there is no necessity of our going into or discussing other parts of the indictment. The charging part of this count of that indictment is as follows:

"Oliver P. Jewell, late of the county of ————on the ———— with force and arms ———— in and upon the body of one James McGuinn, in the peace of the Territory then and there being, feloniously, wilfully, premeditatedly and of his malice aforethought, did make an assault, and that the said Oliver P. Jewell, a certain pistol then and there charged with gun-powder and leaden bullets, which said pistol, he, the said Oliver P. Jewell, in his right hand then and there held, and then and there feloniously, wilfully, premeditatedly, and of his malice aforethought, did discharge and shoot off; to, against and upon the said James McGuinn;" then follows the statement that with the same intent, and deliberation and malice, the said Jewell did strike, penetrate and wound the said McGuinn. Then follows the description of the wound inflicted, and the allegation that of said wound

the said McGuinn did die. Now it will be observed that nowhere is it alleged in words or substance that the assault was committed with the premeditated design to effect the death of the deceased or of any other person, which, by the terms of our statute is a material and necessary allegation in the definition of murder when alleged to have been committed under the circumstances described in this indictment. And as the supreme court well says:

"In fact it is no where alleged that the shooting complained of was with any intent to effect death, except in so far as the same may be inferred from the words, 'wilfully, premeditatedly and with malice aforethought,' and these elements might all occur in an aggravated assault."

This count of the indictment was, we think, very properly held bad by the court, as we think there was nothing in the contention of the attorney general that this count should be held good under the definition of murder contained in sec. 2078, which provides that homicide is murder when perpetrated by an act imminently dangerous to others.

It seems to us this position is untenable, for the reason that the defendant must be convicted, if at all, as charged in the indictment, and the indictment in this case contained no language which could be construed as a violation of this section of the statute; and in the case of *Holt v. The Territory*, above cited, the court says:

"The indictment, stripped of the verbiage, simply charges that William Holt did, of his deliberate and premeditated malice, with intent to kill, assault William Fowler, and that he did unlawfully and of his deliberate and premeditated malice, shoot, strike and wound William Fowler, by which the grand jury conclude that the

defendant did kill and murder William Fowler, with his, William Holt's deliberate and premeditated malice."

And in deciding the case, the court uses this language in pointing out the defects in the indictment.

"It charges an assault with premeditated intent to kill, which as we have said is equivalent to charging premeditated design to effect death, but it does not charge that the shooting was done or that the striking, penetrating or mortal wounding, or the killing of William Fowler was done or accomplished with the design or intent to effect his death or kill him."

Now a consideration of the language of the indictment in the case at bar will show that it is in no way a parallel case with the Jewell or the Holt case, and that it does not come within the objections on which these cases were reversed. The indictment in the case at bar contains this language in the charging part of the indictment, in addition to setting forth the means whereby the murder was committed

"W. P. Perkins, did purposely, unlawfully, feloniously, and with malice aforethought, and with the premeditated design to effect the death of one John Blackwell, kill and murder him the said John Blackwell."

And it seems to us that this language clearly and in unmistakable terms meets the objections raised by the court in the case of *Jewell v. The Territory*, and all the other cases cited, and makes the indictment in the case at bar a sufficient charge of murder, and sustains the trial court in excusing jurors for the reason set forth, and was also sufficient reason for overruling the motion for a new trial on that ground. (*Polson v. State*, 137 Ind. 519, 35 N. E. 907.)

Counsel for plaintiff in error next insist that the trial court erred in overruling his two motions for a continu-

ance, but as a postponement of the trial from May 12 to 18 was granted, on the first one, which was based on the absence of a large number of witnesses, most of whom subsequently attended, it is clear that the court committed no error by its ruling thereon. (R. pp. 10 to 19.) The second application is based on the absence of only two witnesses, to-wit: Robert Rutherford and John Finley, (R. pp. 115 to 117.) The testimony of the latter as given by him at the preliminary examination was read in evidence on behalf of the defendant. (R. pp. 454 to 458.) In his first application for a continuance defendant refers to Finley's testimony given at the preliminary and asks that it be made a part of said application for the purpose of showing "the materiality and the nature and character of same." (R. p. 14.) It follows, therefore, that no error can be predicated on the overruling of defendant's second application for a continuance so far as same relates to the testimony of Finley. The only remaining question to be considered so far as defendant's application for a continuance is concerned, is whether or not the lower court committed prejudiced error in overruling same as to Rutherford. The basis of defendant's claim in this regard is stated at top of page 7 in his brief as follows: "The plaintiff (defendant) could not take their depositions because he had not been permitted to plead in said action, until about five minutes before he was placed on his trial." The record fails to bear out defendant's statement that he was not permitted to enter his plea at an earlier date, but, on the contrary, shows that he purposely avoided entering same, and that when finally called upon by the court to do so, stood mute. As bearing upon this question we call attention to the following additional facts: The indictment

was returned against defendant on April 11, 1898, (R. p. 2) and he was arraigned and give 24 hours to plead on April 12, 1898, (R. p. 3.) He filed a demurrer to the indictment on April 13, 1898. (R. p. 6.) His demurrer was withdrawn, and a motion to quash filed, heard and overruled on April 5, 1899, nearly a year after the returning of the indictment. (R. pp. 4 and 5.) His demurrer was considered refiled, presented and overruled on the same date. (R. pp. 5 and 7.) The case was then set for trial on May 12, 1899, (R. p. 7,) a day of the same term of court. (R. p. 18.) This gave defendant ample time to have entered his plea, served notice and taken the deposition of Rutherford, at Foster P. O., I. T., where he was then located, according to defendant's affidavit. (R. p. 116.)

Under the provisions of our code of criminal procedure, the court is required to have a defendant, against whom an indictment has been returned, arraigned and given an opportuinty to plead thereto. (Okla. Stat. sec. 5090, *et seq.*) Such defendant then, or at a future time to be fixed by the court, must either demur to the indictment or enter his plea. (*Id.* sec. 5117.) There is no provision of our statute requiring the court again to arraign a defendant after his demurrer has been overruled, but it then becomes the duty of the defendant to enter his plea. Whether or not the defendant could waive the formal entering of an oral plea raising an issue of fact so as to render valid a subsequent conviction is not presented, but we hold, that when such defendant has been arraigned, and has his written pleadings challenging the sufficiency of the indictment overruled in ample time for him to have taken the deposition of a wit-

ness residing without the Territory before the day set for trial, he cannot be heard to claim that he was prejudiced by reason of his failure to procure such deposition.

A part of the testimony which defendant alleges Rutherford would have given is admitted by the witnesses for the Territory, and all of it, except one point, is merely corroborative of what was testified to by other witnesses for defendant. The only material point upon which, according to defendant's said affidavits for continuance, Rutherford's testimony would have been different from that of defendant and his other witnesses, is as to where he and defendant had started to go when they left defendant's saloon. In each of said affidavits we find the following statement:

"That soon afterwards the said defendant and said Rutherford left their place of business to go into the dance, that was being carried on in the building immediately east, and next to the place of business of defendant." (R. pp. 11 and 115.)

Defendant's testimony relative to the same matter is, in part, as follows.

"I came back in the house and took Bob Rutherford, took hold of him and says, 'Bob, let's go home.'" (R. p. 541).

"Question. Where were you going when you was going in that easterly direction? Answer. I was taking Bob Rutherford home and trying to————." (R. p. 544.)

Thus it is seen that if Rutherford had been produced as a witness and had testified as defendant stated he would, in both applications for continuance, his testimony would have been in direct conflict with that of defendant himself, on what defendant's counsel now claim

—33

was a very material point. In fact, Rutherford's testimony thereon would have certainly corroborated that given by several witnesses for the Territory.

In view of all the foregoing facts it is manifest that the trial court committed no error in overruling said applications for a continuance. (4 Enc. Pl. & Pr., 8; *People v. Thompson,* 4 Cal. 239; *State v. Brooks,* 4 Wash. 328, 30 Pas. 147.)

Counsel for defendant below next insists that the court erred in admitting certain testimony on behalf of the Territory showing the threatening language and conduct of defendant and said Robert Rutherford, toward the deceased, during the evening just prior to the homicide, and while they were together in the defendant's saloon. This objection is specially directed to a portion of the testimony of R. N. Cantrell, detailing certain statements and demonstrations of Rutherford, while not in the immediate presence of defendant. As counsel well states, "The court admitted this testimony on the theory of a conspiracy." (Brief p. 11.) Counsel then proceed to make the following remarkable statement, in view of the testimony, to-wit: "No attempt was ever made by the prosecution to establish a conspiracy, and the court in his instructions to the jury entirely ignored the conspiracy theory." (*Ibid.*)

Whether or not "the court in his instructions * * * ignored the conspiracy theory," has no bearing upon the question, which is: Did the testimony on behalf of the Territory show, or tend to show, such a joint or common purpose, on the part of the defendant and Rutherford, to provoke a quarrel with deceased and therein take his life, or do him some serious bodily harm, as to make the statements and conduct of the latter, while in

the saloon of and in company with, the former although (perhaps) not in his immediate presence and hearing, competent evidence against said defendant? On this proposition we invite special attention to the following excerpts from the testimony:

"Question. Thomas E. Berry: 'What did Mr. Perkins and Mr. Rutherford say there when you were talking to them?' Answer: The substance of it was that somebody, some person from Lexington, had insulted parties there, especially Mr. Rutherford, and that he could not do that—that anybody that come to Avoca and called one of our people a son of a bitch, or something like that, could not do it and get away doing well or something of that kind. Now that is the substance of it. That is as near as I can remember it at this time.

"Q. The court: 'I want to know who use that language, who was it that said that. A. They were both talking; sometimes one was talking. I think I would be safe to say that perhaps both of them used substantially the same words. (R. pp 130-131.)

"Q. What did you see Mr. Perkins have while you were in there the second time, if anything? A. One time I do not remember now, they was behind the bar talking.

"Q. Who were behind the bar? A. Mr. Perkins and this Rutherford, and the remark was made by Mr. Perkins that if they don't think I am ready for them I will just show you, and he picked up two or three pistols under the bar and held them up, I don't remember whether he laid them on the bar or just held them in his hands. I prevailed with him that he didn't need them and he laid them back. I didn't see whether he put any of them in his pocket, anyhow they was laid down.

"Q. What else did you see them do in connection with the pistols? What did they say, if anything, with reference to going into the dance hall? A. The principal talk was they were going into the room where they were dancing and they were going to dance anyhow.

"Q. By the court: 'Mr. Berry, what did you mean by they?' A. Mr. Perkins and Mr. Rutherford together.

"Q. You mean they both told that? A. They were both talking together, and I saw them get out their money, one party got out so much and the other one said I have got so much, and we will go in there and we will dance, and if anybody prevents us or anything, there will be trouble and all those things.

"Q. Was there anything said with reference to what they would do if they were prevented? A. There was a great deal said. There was a remark made that if certain things was done and said, they would better have a spade ready for morning, something like that.

"Q. Who said that? A. At one time I heard Perkins make a remark of that kind.

"Q. Which time was it that you heard Mr. Perkins say that? A. I won't say which time, whether it was the first time or the last time I was in there before this difficulty occurred. When he said it the remark was made with the qualifications that if certain parties done so and so they would better have these things ready. (R. pp. 132 and 133.)

"Q. John H. Hatfield: 'What occurred in there?' A. When I went in there Mr. Perkins and Rutherford seemed to be mad.

"Q. What were they doing or saying to indicate that they were angry? A. They stated that no Lexington sons of bitches could come and run Avoca; if they did they would need their spades sharpened in the morning.

"Q. Who said that? A. I don't know which one of them said it. I could not say positive which one said it.

"Q. Where were these two parties when you went back in there? A. I think Mr. Perkins was behind the bar; and I think Mr. Rutherford was in front of it, I am not certain.

"Q. How close together were they? A. Some 2 or 3 feet. (R. pp. 171, 172.)

"Q.   R. M. Cantrell:  'State what you heard between Mr. Berry and these parties there?'

"Q.   The Court: 'Between Berry, and Perkins and Rutherford; were they all together?'  A.   They were; They was talking about the trouble, the reason they had no better gatherings and such as that was  on account of the disturbances and were pleading for peace.

"Q.   What did you hear Mr. Perkins and Mr. Rutherford say?   A.   I don't remember only what Rutherford said.   Rutherford said more than Perkins about it.

"Q.   What did you hear Rutherford say in the presence of Perkins?   A.   Why Rutherford said that the Lexington boys come down to run over Avoca, and him and Pate could clean them up.—I believe was the words Rutherford used.

"Q.   Now state the language he used?   A.   That is something like it, only with an oath.

"Q.   What was the oath, that is what  I  want?    A. Well it was 'dam Lexington sons of bitches,' I believe is the way that he said it, the way Rutherford spoke it I think.

"Q.   Where was he and Perkins at that time?   A.   In the saloon there.

"Q.   Behind the bar or in front of it?   A.   They was in front of the bar.

"Q.   Both of them?   A.   Yes sir.

"Q.   What were they doing?   A.   They were just in there talking.

"Q.   What did you hear Perkins say now?   A.   He said that they could not do it I believe.

"Q.   Said who couldn't?   A.   Lexington boys.

"Q.   Couldn't do. what?   A.   Couldn't  run   over Avoca."   (R. pp. 204 and 205.)

The foregoing is but a small portion of the testimony contained in the record of a similar character but is en-

tirely sufficient, especially when considered in connection with the undisputed facts that the defendant and Rutherford left the saloon of the former together and armed with deadly weapons shortly before the homicide, to show or (at least) is of such a character as to have a strong tendency to show a plot or conspiracy on the part of the defendant and Rutherford to provoke a deadly quarrel with deceased, and his companion, one Joe Stewart.

"Slight evidence of collusion is all that is required." (2 Rice on Evd. 865, sec. 333; 1 Greenleaf on Evd. [13 ed.] sec. 111; Wharton's Law of Evd. [3 ed.] sec. 1205; State v. Nash, 7 Iowa, 347; McKee v. State, 12 N. E. 510. The Anarchist's case, 12 N. E. 865.)

It is next contended that counsel for plaintiff in error was not allowed by the court to go into detail in cross examination, of the witness Hatfield, touching his relationship and friendly relations with the deceased. The court below held:

"That an admission by a witness that he was a friend to deceased or unfriendly to defendant was the extent of the inquiry."

We think an examination of the record will show that the trial court permitted the defendant's counsel to examine on this branch of the case to the full extent permissible, and we fail to find anything in the rulings of the court in this particular that could have in any way prejudiced the rights of the defendant. This was a subject largely in the discretion of the trial court, and unless the records show an abuse of this discretion, this court will not interfere. (Stewart v. Kindall, [Colo.] 25 Pac. 990; 1 Thompson on Trials, sec. 458.)

The next contention of counsel, based on his 20th assignment of error, is wholly without merit. The fact

that the witness, John H. Hatfield, failed, at the preliminary examination, to testify concerning a material matter which he detailed at the trial, cannot be shown to impeach him. Before such omission would have become material, it must have been shown that the witness was "under such circumstances that he was called upon as a matter either of duty or interest to state the whole truth in regard to such transactions," and then the question of whether or not such fact may be shown is almost entirely a discretionary matter with the court. (10 Enc. Pl. & Pr. 299; *Hayden v. The State,* 30 Tex. Crim. Rep. 404, 20 S. W. 764; *Stovens v. Blake,* [Kan.] 48 Pac. 888.)

The next contention in behalf of the plaintiff in error is based on the 24th assignment. It is only necessary to say that when the impeaching questions were propounded to Dr. Wilson, he was testifying as a witness for the defendant, (R. p. 272.) that he admitted making the statements to which his attention was called, in his testimony at the preliminary; and that, under the rule applicable to the question in this Territory, it was not abuse of discretion for the court to admit in evidence these previous statements for the purpose of impeaching the witness. (10 Enc. Pl. and Pr. 318-319; *John v. Leggett,* 28 Kan. 590; *State v. Sorter,* 52 Kan. 531, 34 Pac. 1036.)

The next contention of counsel for plaintiff in error is that the court erred in refusing to permit him to give in evidence the statements which he claims to have made just before he and Rutherford started out of the saloon. The court's ruling is to the effect that these declarations were incompetent, and is undoubtedly correct; however, defendant's counsel succeeded in getting them before the jury, and no motion was made to have them withdrawn;

hence, in any event, this ruling could not have been pre-
judicial. But, as the question presented thereby is one
which counsel claims this court has decided contrary to
the ruling of the trial court, we have thought best to
give our views of its merits. Much of the confusion and
apparent contradictions to be found in the decided cases
upon this question is due to the failure of some of the
courts to properly determine the *res gestae* of the particu-
lar cases before them. Upon this question Dr. Greenleaf
says:

"These surrounding circumstances, constituting parts
of the *res gestae*, may always be shown to the jury along
with the principal fact; and their admissibility is deter-
mined by the judge, according to the degree of their
relation to that fact, and in the exercise of his sound dis-
cretion; it being extremely difficult if not impossible, to
bring this class of cases within the limits of a more par-
ticular description. The principal points of attention
are, whether the circumstances and declarations offered
in proof were contemporaneous with the main fact un-
der consideration, and whether they were so connected
with it as to illustrate its character." (1st Greenleaf on
Evidence, sec. 108.)

After a somewhat careful investigation of the subject
we venture the statement that the *res gestae* of an action
comprehends only the facts or transactions which consti-
tute the triable issues therein, and, unless a declaration
is contemporaneous with one of the main issues, and is
so related thereto as to illustrate and explain the same,
it cannot properly be considered a part of the *res gestae*.
Thus, in the case at bar, the *res gestae* was the shooting
and killing of John Blackwell by defendant. The declara-
tions which defendant offered, in fact produced, in evi-
dence, were neither contemporanous with, nor, in any

special manner related to this transaction. They were "declarations made sometime before the act, and stand alone by themselves;" hence were not competent. (21 Am. and Eng. Enc. of Law, 100.)

It is well and concisely stated in *Edmunds v. Curtis*, 8 Col. 605, 9 Pac. 793, that:

"The transactions out of which an action for damages arose being the running away of a hired horse driven at the time by the defendant's agent, whereby the horse, wagon, etc., the property of the plaintiff, were injured, the foundation of the action was the agent's negligence in connection with the accident, and the runaway and accident were the *res gestae*."

"The declarations of a party, to be admissible as a part of the *res gestae*, must be contemporaneous with, or at least so connected with the main fact in issue as to constitute a part of the transaction and thus derive credit from the main fact or act itself, to explain or characterize which, it is offered in evidence." *(Conlan v. Grace*, 36 Minn. 276, 30 N. W. 880; see also, *Barber v. Bennet*, 62 Vt. 50, 19 At. 978; *State v. Walker*. [Me.] 1st At. 357.)

There are some exception (more apparent than real) to the general rule stated in the foregoing cases. The most important of these may be classed as follows: 1st. Declarations of a party as to the character of its possession of personal property while exercising such possession where ownership of the property is the main issue; 2nd. Declarations of a party (especially to a physician) concerning his bodily or mental feelings, sufferings, etc., where his physical condition at the time is a material issue; 3rd. Declarations of a party in possession of property alleged to have been stolen, made at the time of his apprehension, and tending to explain his said possession, where such possssion is urged as one of the

principal criminating circumstances. This exception covers the point decided in *Mitchell v. The Territory*, 7 Oklahoma, 527. There are undoubtedly some instances where the declarations of a party not immediately connected with the main or triable issue may properly be admitted as a part of the *res gestae*. For instance, if the defendant and deceased in the case at bar had been participants in one or more personal difficulties or quarrels prior to the homicide, and an issue had been raised as to who was the responsible party therein, then we concede that the declarations of either party during one of these encounters, explanatory of his conduct while engaged therein, would have been competent as a part of the *res gestae*. This is all that was decided in *Mack v. The State*, 48 Wis. 271, 4 N. W. 449, and is certainly as far as the rule should be extended in causes of this character. There was another strong reason why the statements of defendant in that case were held to be admissible, to-wit: "The state having opened the door to admit what was said by the parties on this occasion for the purpose of prejudicing the cause of the accused, the court could not justly close it against the full and complete statement of all details of the conversation attending it."

(See also in this connection 21st Am. & E. Enc. of Law, 111 to 113.)

As already seen, "no inflexible rule as to the length of the interval between the act charged against the accused and the act or declaration of the complaining party can be formulated." (*Id.* 113) But trial courts should be careful never to admit such testimony unless clearly within the rule.

"In very many instances, this evidence trenches closely upon the forbidden field of hearsay, and its admission

should be carefully guarded. Courts are very conservation with reference thereto. The disposition is not to extend the rule beyond the landmarks clearly pointed out by early adjudicated cases." (*Edmunds v. Curtis*, 9 Pac. 973.)

"This court has felt the necessity of confining this exception to the general law of evidence to very narrow limits, in order to exclude hearsay and to prevent parties from making evidence for themselves; and since parties have been permitted to testify, there is, perhaps, an additional reason why great strictness should be used in admitting as evidence the declarations of a party in his own favor when made in the absence of the other party." (*Pickering v. City of Cambridge, Mass.*, 10 N. E. 827.)

"Declarations are sometimes admissible in evidence as part of the transaction when they qualify or give character to it. These declarations did neither. The fact of ill health and impaired bodily strength was the material fact, and that could not be proved by the unsworn statement of the plaintiff. Hearsay evidence as a rule is excluded, and the declarations and statements of the parties, or of third persons, are not received except under peculiar circumstances and as a necessity. Statements made out of court and without the sanction of an oath, are dangerous as evidence, and the rights of suitors ought not to be put in peril by them. The instances are few in which declarations and unsworn statements made out of court have been permitted to be given in evidence as proof of the facts sought to be established. Statements and representations of a sick person of the nature, symptoms and effects of his malady have been received as original evidence and especially when made to a medical attendant to enable him to minister to the patient. They have been regarded as competent and entitled to weight.

\* \* \* There is good reason for their admission when made to the attending physician or surgeon, as upon them in connection with the manifestations and symptoms of injury or disease the opinion of the expert

is based, and the treatment governed. But in every other case the admission of testimony so exceptional as a departure from the established rules of evidence must be referred to the necessities of the case, and the inability of the party to give evidence of a higher and more satisfactory nature. The general rule is that the best evidence of which the fact is susceptible must be adduced. And secondary or inferior evidence will not be received so long as the higher and better evidence can be had. The plaintiff was a competent witness to prove the state of his health at the time he handled the bags of clover seed and performed the other labor mentioned. And it was not necessary to resort to other and inferior evidence; and so long as his sworn statements were admissible his unsworn declarations should not have been received.   *

*   *   But by the amendment of the code in 1869, (sec. 398.) there is no longer a necessity for giving in evidence the declarations of a party, if he is living and able to be sworn and examined as a witness; and the reason of the rule ceasing, the rule itself, adopted with reluctance and followed doubtingly and cautiously should cease." (*Reed v. N. Y. Central R. R. Co.* 45 N. Y. 574; *Stone v. Bird,* 16 Kansas, 488.)

In the case at bar, defendant was permitted without objection to state his purpose in leaving the saloon with Rutherford   He says:

"I was taking Bob Rutherford home."

Here we have defendant's sworn statement as to where he was going. Then in the language of the New York case, his unsworn declarations should not have been received.

The next contention for plaintiff in error, based on his 27th and 28th assignments, is wholly without merit or foundation in fact. Whether or not testimony for the purpose of impeaching the witness, Wright, by showing that he made the statements attributed to him, in the

questions propounded, should have been admitted, is immaterial, as such was not offered. That a trial court may properly permit a cross examination even on collateral matters, "for the purpose of disparaging or discrediting a witness," is too well settled to need further comment here. (8 Enc. Pl. and Pr. 118.)

The question propounded to this witness containing a statement which he denied, and upon which impeaching evidence was introduced, reads as follows:

"Question. I will ask you if you didn't on that occasion, while here, in the presence of Oak Berry and F. W. Brady, on this street, on Broadway, right opposite this court house, on the other side of the street, say, 'Well boys, Blackwell is dead, and nothing we can do can help him, so let's do the best we can to get Pate Perkins out,' or 'Pate out of it,' or if you used that language in substance?"

This impeaching testimony tended to show a corrupt purpose on the part of the witness Wright, not only to unduly favor defendant himself, but, to induce other witnesses to do so, and was therefore clearly competent. (10 Enc. Pl. and Pr. 297.)

The next contention of counsel for plaintiff in error which we regard as at all worthy of attention, is based on his 39th and 40th assignments, claiming, 1st, that the court erred in sustaining an objection to the questions stated on page 20 of his brief which reads as follows:

"Question What relation if any, did you know at that time that John Hatfield had with deaceased, John Blackwell?"

This question is clearly incompetent, because indefinite as to the character of the relation mentioned, and calling for a conclusion which might have been based on actual knowledge, hearsay, suspicion, or almost anything

else. The 40th assignment is based on the fact that the court on objection of counsel for the Territory did not permit defendant to state why he refused to go into the street with Hatfield. We call attention to the following question and answer, which we think answers this contention.

"Question. Now why didn't you go out into the street when John Hatfield spoke to you? Answer. I had heard these threats, heard of them, and I didn't care to get mixed up with anything."

The only ground for complaint which counsel has is that the court refused to permit the defendant to answer the same question again.

Furthermore as to the ruling complained of by counsel in his 39th assignment of error, we call attention to the fact that defendant was subsequently permitted, by the court, to answer substantially the same question.

"Question. Did you, at that time and prior to the homicide, know of the relations between John Hatfield and Blackwell? Answer. I did.

"Q. Did you know the relation of friendship existing between John Blackwell and John Hatfield, at the time and prior to the homicide? A. I did."

We think we have noticed and given our views on all the assignments of error urged by counsel for plaintiff in error, which have been seriously presented to the court. Necessarily when the assignments are as numerous as in the present case, to-wit: fifty-eight, it would be practically impossible to devote much time to each within the space of an ordinary opinion, but we have endeavored to get a clear comprehension of the points raised, and to give our views in regard to the same, and on a

careful examination of the entire case, as presented by the record, we fail to find any substantial error, or any reason why the case should be reversed. Hence, the decision of the lower court will be affirmed.

Burwell, J., having presided in the court below, not sitting; all of the other Justices concurring.