NORMAN STURGIS V. STATE.

No. 340.    Opinion Filed May 19, 1909.

(102 Pac. 57.)

1.    APPEAL AND ERROR—Briefs—Failure to Fully Present Points —Review.   (a) Assignments of error which are not presented fully in the briefs of counsel for the appellant will be treated as abandoned by this court, unless they relate to some fundamental question.

(b) It is the policy of this court to pass upon every material question involved in a case which is in good faith properly submitted for decision. The sooner questions of practice are settled in criminal cases the better it will be for the administration of justice in Oklahoma. At present these questions are in a state of utter confusion. This is especially true in prosecutions for the violation of the prohibition law.

2.    INDICTMENT AND INFORMATION— Intoxicating Liquors — Duplicity—Single Act Constituting Different Offenses—Intrastate Transportation—Information—Sufficiency.   (a) An indictment or

information must charge but one offense; but when the same acts may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty, the different offenses may be set forth in separate counts in the same indictment or information. But in such cases the information or indictment must show upon its face that the separate counts all refer to one and the same transaction. As to how this should be done, see opinion.

(b) Selling intoxicating liquor, and shipping or conveying such liquor from one place in the state to another place in the state, are separate and distinct acts, and cannot be joined in the same information or indictment.

(c) An information for transporting or conveying intoxicating liquors from one place in this state to another place in the state must designate the place from which and to which said liquors were so transported or conveyed.

3. TRIAL—Opening Statement—Reading Information. (a) It is not error for the county attorney, as a part of his opening statement of a case to the jury, to read the information and the affidavit upon which it is based.

(b) Nothing said in an opening statement is to be taken by the jury as evidence in the case, and if counsel for the defense have any apprehensions upon this subject he should request the court to so instruct the jury.

4. WITNESSES— Parties to Offenses— Principals— Evidence —Acts and Declarations of Conspirators and Codefendants—Furtherance of Common Purpose—After Accomplishment of Object—Impeachment of One's Own Witness—Surprise—"Principals." (a) The principles of law applicable to and enforced in civil cases as to agency are not a part of criminal jurisprudence.

(b) Our statute abolishes all of the distinctions of the common law in criminal cases as to accessories and principals in the first degree and in the second degree.

(c) All persons concerned in the commission of a crime, whether it be a felony or a misdemeanor, and whether they directly commit the crime or aid and abet in its commission, though not present when it is committed, are "principals," and should be prosecuted, tried, and convicted as such.

(d) There is no such thing in this state, in misdemeanors, as accessories after the commission of the offense.

(e) Anything said or done by any person who is concerned in the commission of an offense, in pursuance of a common design to commit the offense, and before the offense is committed, or during its commission, is competent evidence against any other

persons who are concerned in the commission of the offense, whether such act was done or said statement was made in the presence of such other persons or not; but this is not true as to acts done or words spoken after the commission of the offense.

(f) In order to make the acts or words of a person who was concerned in the commission of an offense competent as evidence against other persons who were also concerned in the commission of the offense, it is not necessary to prove beyond a reasonable doubt that said persons were concerned in the commission of the offense. Slight evidence that such parties were concerned in the commission of the offense is sufficient to render such evidence competent.·

(g) Before the acts or statements of a person concerned in the commission of an offense are admissible as evidence against other persons, who are also concerned in the commission of such offense. some evidence should 'be introduced showing or tending to show that such persons were concerned in the commission of such offense.

(h) Before liquor or anything which contains or has contained liquor can be introduced for the inspection of the jury, it must 'be identified and proven to have been in the possession of the defendant, or under the control of the defendant, or of some other person who was concerned with the defendant in the unlawful possession or disposition of such liquor or other article.

(i) A party who places a witness upon the stand thereby vouches for his veracity, or at least vouches that the witness is not so deeply steeped in moral turpitude as not to be worthy of some credence. Therefore such party will not be permitted to impeach such witness by showing his general bad character for truth.

(j) Where a party has been deceived or entrapped into placing a witness upon the stand, having reasonable ground to believe and believing that the witness will testify to facts favorable to such party, and the witness, when upon the stand, testifies to facts injurious to such party and conflicting with previous statements made by such witness, it would be a perversion of justice to deny to such party the right to introduce in evidence statements made by such witness conflicting with the testimony so given which was injurious to such party. This may be done upon the ground of surprise, to explain the action of the party in placing the witness upon the stand, and to destroy the injurious effects of such testimony.

(k) A party cannot impeach his own witness by introducing in evidence conflicting statements made by him, unless he shall testify injuriously to the party placing him upon the stand. The mere fact that the witness does not testify as the party expected

him to do will afford no ground for the introduction in evidence of previous contradictory statements made by such witness.

(1) When contradictory statements made by a witness are admissible in evidence for the purpose of impeaching him, they must be confined to contradictions of the testimony of the witness which are injurious to the party seeking to impeach him, and it is the duty of the court to clearly inform the jury that such statements cannot be considered as independent substantive evidence against or in favor of the defendant, and that the jury can only consider such contradictory statements for the purpose of affecting the credibility of the witness, if they decide that such statements do have this effect, and that it is unlawful for the jury to consider such statements for any other purpose.

(m) When a party places a witness upon the stand with notice that such witness will testify adversely to such party, he cannot claim surprise at such testimony, and will not be permitted to impeach the witness in any manner.

5. **APPEAL—Presentation and Reservation of Grounds of Review— Improper Argument of Counsel—Comments on Failure of Accused to Testify.** (a) When counsel for the state goes out of the record and makes remarks injurious to the defendant, it is the duty of the counsel for the defendant to object to such remarks and move the court to exclude them from the consideration of the jury. An objection to such remarks is only a protest against the line of argument being pursued. If this matter is deemed of sufficient importance to be reserved for review by this court, a motion to exclude such remarks from the consideration of the jury must be made, and, if this motion is not sustained, an exception must be taken, otherwise this court is not required to review the question upon appeal.

(b) If the remarks of the prosecuting attorney are of such a character that their exclusion from the jury will not cure the injury done, then no motion to exclude need be made, and the question as to whether they were proper will be properly presented on appeal by a simple objection, without being followed by a motion to exclude.

(c) Our statute is mandatory, and, when the defendant has failed to become a witness in his own behalf, this fact must not, directly or indirectly, be mentioned or in any manner referred to or called to the attention of the jury. If such an attempt is made by counsel for the defense, the court must at once intervene and reprimand the counsel making such an attempt, and see that it is not repeated. If such an attempt is made by the prosecuting attorney and a conviction follows, a new trial must be granted to the defendant.

(d) It is improper for the court or any other person to refer or in any manner call attention, in the presence of the jury.

to the fact that a defendant has failed to testify in his own behalf; but if this matter, in any manner, is called to the attention of the jury, then the court should instruct them that such failure of the defendant to become a witness in his own behalf is not to be considered by them as a circumstance against him, and that the law forbids them from discussing this fact or allowing it in any manner to influence them in considering the case and in arriving at a verdict.

6. **INSTRUCTIONS—Reduction to Writing—Statements Not Instructions.** Oral statements made by the court to the jury, with reference to the form or character of their verdict, which do not contain instructions or directions upon some question of law involved in the trial, or comment on the evidence, do not come within the statute which requires instructions to the jury to be reduced to writing, unless waived by the defendant. For illustration, see facts stated in the opinion of the court, which are held not to constitute error.

(Syllabus by the Court.)

*Appeal from Tulsa County Court; N. J. Gubser, Judge.*

Norman Sturgis was convicted under an information charging the selling of intoxicating liquor and the conveying of intoxicating liquor from one place to another in the state, and appeals. Reversed and remanded.

On the 31st of December, 1907, a prosecution was instituted against Norman Sturgis, Arthur Sturgis, and Walter Steen by information, charging them with the commission of two separate and distinct offenses, viz.: First. Selling intoxicating liquors to certain parties whose names were unknown. Second. With transporting and conveying intoxicating liquors from one place in the state to another place in the state, but not designating such places. The case being called for trial, the defendants assailed the information upon the ground of duplicity, in that it attempted to charge two offenses based upon separate and distinct acts of the defendants. This motion was, by the court, overruled, and the defendants then obtained a severance. Walter Steen was placed upon trial first. Norman Sturgis, who will hereinafter be called the defendant, was placed upon trial and found guilty by the jury. A mo-

tion for a new trial was filed and overruled, and the case is regularly before us on appeal.

*Sleeper & Davidson,* for appellant.—

On question of duplicity in indictment: *People v. O'Donnell,* 46 Hun. (N. Y.) 358.

On prosecuting attorney's reference to defendant's failure to testify: *Wilson v. Territory,* 9 Okla. 331; *State v. Balch,* 31 Kan. 465.

On the making of oral statements by judge to jury: *Swaggert v. Territory* (Okla.) 50 Pac. 96.

*Fred S Caldwell,* for appellee. No copy of brief for appellee reached the reporter.

FURMAN, PRESIDING JUDGE. (after stating facts as above). First. Counsel for the defendant in their brief say:

"While we believe that the court erred in each and every one of the 26 assignments of error, yet some of them are so flagrant that we do not deem it necessary to call the court's attention to the minor errors appearing in the record. Those we do insist upon as grounds for reversal are the 5th, 6th, 11th, 12th, 14th, 15th, 16th, 17th, 18th, 19th, 21st, 22d, 24th, 25th, and 26th assignments."

It is the settled policy of this court to treat as abandoned assignments of error which are not presented in the briefs filed in the case, unless we shall discover some fundamental error in the record before us. We will therefore confine our investigations and discussions to those questions which are presented in the brief of counsel. The presentation of so many assignments of error will necessarily require a lengthy opinion, as this court does not propose to dodge or evade a single question properly presented for decision, it matters not how much labor it may entail upon this court. If counsel properly raise a question in good faith, it is their right to have it decided; nothing is gained by saying, "The other questions will probably not arise upon a second trial." Our experience is that such question will arise upon a second trial. The sooner questions of practice are settled, the better it will be

for the administration of justice in Oklahoma. At present questions of practice are largely in a condition of rank confusion. This is especially true in prosecutions for violations of our prohibition law. This should not be a matter of surprise when it is remembered that our officers generally are overcrowded with work and do not have access to good libraries. It is the duty of this court to see that these questions are settled as rapidly as possible, so that we may have a uniform system of practice in Oklahoma. We therefore make it a rule to pass upon every material question involved in a case, which is properly presented.

Second. Under assignments 5 and 6, counsel for the defense assail the information in the case upon the ground of duplicity, in that it charges more than one offense. The information is as follows:

"Amended Information. Be it remembered that M. A. Breckenridge, county attorney in and for Tulsa county, state of Oklahoma, who prosecutes in the name and by the authority of the state of Oklahoma, comes here in person into the county court of said county this 2d day of January, A. D. 1908, and upon the affidavit of Joe Holmes, duly subscribed and sworn to by him as provided by law, and the same is hereto attached, marked 'Exhibit A' and made a part hereof, gives the court to understand and be informed that on the 31st day of December, A. D. 1907, in Tulsa county, state of Oklahoma, Norman Sturgis, Arthur Sturgis, and Walter Steen, late of said county, and within the jurisdiction of this court, did unlawfully sell, barter, give away, and otherwise furnish intoxicating liquors, to wit, one pint of whisky, one drink of whisky, one bottle of beer, one pint of ale, and one pint of wine to John Doe and Richard Roe, whose real names are unknown, against the peace and dignity of the state of Oklahoma. And the said county attorney in and for Tulsa county further gives the court to understand and be informed upon the affidavit aforesaid that on the 31st day of December, A. D. 1907, in Tulsa county, Norman Sturgis, Arthur Sturgis, and Walter Steen, then and there being, did then and there unlawfully ship and convey intoxicating liquors, to wit, twelve pints of whisky, twelve bottles of beer, five gallons of ale, and five gallons of wine from one place within this state to another place therein, without lawful authority to ship and convey the same, contrary to the form of the

statute in such case made and provided, and against the peace and dignity of the state of Oklahoma."

This information charges two distinct offenses, viz., a sale and a shipment. Is this permissible under our statute? Section 5360, Wilson's Rev. & Ann. St. 1903, is as follows:

"(5360) § 224. The indictment must charge but one offense, but where the same acts may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty of, the different offenses may be set forth in separate counts in the same indictment and the accused may be convicted of either offense, and the court or jury trying the cause may find all or either of the persons guilty of either of the offenses charged, and the same offense may be set forth in different forms or degrees under different counts; and where the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count."

This statute starts out with the mandatory statement that "the indictment must charge but one offense." It then proceeds, "but where the same acts may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be convicted of, the different offenses may be set forth in separate counts in the same indictment," etc. The same rules of construction apply alike to informations and indictments. The essential elements are the same in informations that they are in indictments. Therefore, the above statute must control our decision of this question. To our minds it is clear that when, under this statute, an indictment or information attempts to set forth in separate counts two or more different offenses, it can only be done when the separate counts all relate to but one and the same transaction. This is the only rational construction which can harmonize the statement that an indictment must charge but one offense with the following portions of the same section. The courts have no right to so construe a statute as to make it contradictory and reduce it to an absurdity, when it is capable of a rational construction which will harmonize all of its apparently conflicting provisions. We, therefore, hold that it is only per-

2 Cr.—24

missible for an information or indictment to contain more than one count when the separate counts all relate to the same transaction and are necessary to prevent a variance between the allegation and the evidence.

This rule is not only in harmony with section 5360, Wilson's Rev. & Ann. St. 1903, but also with the decisions of other appellate courts in states where similar laws have been enacted. Take, by way of illustration, the great state of New York. It has the following statute (Code of Criminal Procedure) :

"Sec. 278. The indictment must charge but one crime and in one form except as in the next section provided.

"Sec. 279. The crime may be charged in separate counts to have been committed in a different manner or by different means, and where the act complained of may constitute different crimes, such crimes may be charged in separate counts."

This statute is substantially identical with our statute. In the case of *People. v. O'Donnell,* 46 Hun. 358, the New York court has construed these provisions in their application to prosecutions under the liquor laws. In that case the indictment charged in one count selling spirituous liquors in quantities less than five gallons at a time, to be drunk on the premises, without having a license therefor, and in four other separate counts unlawful sales made on four different occasions. The indictment was demurred to on the ground that it charged more than one crime. The court holds that the demurrer should have been sustained. It says in the course of its opinion:

"Before the enactment of the Code of Criminal Procedure, an indictment was not bad because of the joinder of separate and distinct misdemeanors, although followed by different penalties, and a general judgment upon it was good where the sentence was single and appropriate to each of the counts upon which a conviction was had. *People v. Dunn,* 90 N. Y. 107. But the Code of Criminal Procedure provides that the indictment must charge but one crime and in one form, except the crime may be charged in separate counts to have been committed in a different manner, or by different means, and, when the act complained of may constitute different crimes, such crimes may be charged in sep-

arate counts. Code Cr. Proc. §§ 278, 279. Ever since the adoption of the Code, when the act complained of may constitute different offenses, such offenses may be charged in separate counts of the indictment. *People v. Infield,* 1 N. Y. Cr. R. 146; *People v. Kelly,* 3 N. Y. Cr. R. 272. So an indictment containing varying allegations of the crime, but which shows upon its face that those counts relate to but one and the same transaction, is good. *People v. Cole,* 2 N. Y. Cr. R. 108. In the case at bar, the indictment charged the illegal sale of spirituous liquors on at least four different occasions, and upon each occasion to entirely different persons. Each of these charges is made as an independent charge or count in the indictment. The indictment not only does not show upon its face that these separate counts relate to the same transaction, but does show quite conclusively that each was a separate and distinct transaction. This indictment was, we think, obnoxious to the objection that it charged more than one crime."

The precise question which we are now considering has been passed upon by the Supreme Court of California. That court said:

"Under our practice an indictment must not charge more than one offense, but it may set forth that offense in different forms under different counts. Cr. Prac. Act, § 241. But this must be done in such a way as to show clearly upon the face of the indictment that the matters and things set forth in the different counts are descriptive of one and the same transaction. The object of allowing different counts is to provide against fatal variances between the material parts of the indictment and the proofs brought forward in their support. Where a material fact is doubtful—that is to say, where it is uncertain as to which of two or more conditions is the true one, and either is equally effectual in completing the offense—it is proper to frame a count embracing each, in order that there may be at the trial no fatal variance between the matters alleged and the matters proved.

"By way of illustration, take a case of larceny. Suppose, from the evidence in the possession of the pleader, and upon which the indictment is to be framed, it is doubtful whether the stolen goods were the property of A. or B., and it is material, for the purpose of identifying the larceny (Cr. Prac. Act, § 243), to allege the ownership of the goods with certainty. In such a case two counts, one alleging the ownership in A. and the other in B., is proper. But it must appear from the averments in the

second count that the larceny therein set forth is the same as that charged and described in the first count, and unless this is done the indictment will be obnoxious to the objection that it charges more than one offense.

"Or, take the present case. The first count charges that the defendant intended to steal the goods of John McRaith. The second charges that he intended to steal the goods of James Mc-Graith. Now, assuming that it was necessary to allege the ownership of the goods, which the defendant intended to steal, in order to make a statement of the offense which would be sufficient in law, the two counts are proper, and there is no legal objection to the indictment merely upon the ground that the ownership of the goods intended to be stolen is charged to be in two different persons, which seems to have been the principal ground relied upon by counsel for the defendant in the court below. The use of the words 'said' or 'aforesaid,' or equivalent expressions in the second count of an indictment, will generally be found indispensable in order to fix the identity of the offense therein stated with that contained in the first count. It is a little remarkable that in the indictment before us those words are not used in a single instance where their presence would have been proper, if not necessary, for the purpose of identification, but are used where they were not needed. Thus the date of the transaction is preceded by the word 'said,' which was not necessary, since the court must know that there can have been but one 21st day of July in the year 1864. But when we come to the dwelling house, the identity of which with that mentioned in the first count must be shown with certainty, neither the word 'said' nor any equivalent expression is used. It is true that it is described, word for word, the same as in the first, but, so far as the use of words is concerned, there is nothing to show that the Crescent City Hotel of the second count is the Crescent City Hotel of the first, except that the name of the hotel and its proprietor is the same in both. The dwelling house having been described in the first count, no further description in the second count was required. A simple reference to it as 'the said dwelling house,' or as 'the dwelling house aforesaid,' was all that was necessary in the second count, and, had that course been adopted, the identity of the house would have been sustained throughout without involving a resort to legal presumptions, and no argument would have been required to show

that the transactions described in the first and second counts were in fact one and the same.

"In this case the identifying facts are the venue or place, the date of the entry, and the house entered. The first and last are stated in the second count by simply repeating the language of the first count, without using the words 'said' or 'aforesaid,' or equivalent expressions, for the purpose of more certainly identifying them. This must, however, be held sufficient on the score of identity, for the court will take judicial knowledge of the fact that there is but one 'county of Sacramento' in the state, and because the identity of the names of the houses and their proprietors is *prima facie* evidence of the identity of the two houses, and that they are in fact one and the same house. The general rule is that the identity of the name is *prima facie* evidence of the identity of the person. *Thompson v. Manrow,* 1 Cal. 428; *Mott v. Smith.* 16 Cal. 554; *Carleton v. Townsend,* 28 Cal. 219; *Jackson v. Boneham.* 15 Johns. 226. And we see no reason why the rule may not apply to houses as well as persons." (*People v Thompon,* 28 Cal. 217.)

In another case the same court said:

"It is proper to add in this connection that the learned judge of the court below was mistaken in supposing, as he seems to have done, that this case was within the four hundred and twenty-fourth section of the Criminal Practice Act, which provides that 'in all cases the defendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment.' * * * Larceny is not necessarily included in burglary, like manslaughter in murder, within the sense of the statute; on the contrary, it is no part of it. The offense of burglary is complete without any larceny being committed. The relation contemplated by the statute does not exist between burglary and such other felony, if any, as may chance to be committed by the defendant at the same time." (*People v. Garnelt,* 29 Cal. 628.)

In another case the same court said:

"The indictment, containing but a single count, charges that the defendant, 'unlawfully and with malice aforethought, and in and upon P. Alibez, C. Alibez, and R. Alibez did wilfully, unlawfully, maliciously, and feloniously administer a poisonous drug, known as strychnine, with intent them, the said P. Alibez and C. Alibez and R. Alibez, to unlawfully and maliciously kill and mur-

der, and did maliciously, unlawfully, and feloniously, then and there, by administering said poisonous drug, to wit, strychnine, unlawfully, premeditatedly, and with malice aforethought, kill and murder the said P. Alibez, C. Alibez, and R. Alibez, contrary to the form, force, and effect of the statute,' etc. The defendant filed a demurrer to the indictment, on the ground that it charges more than one offense; the demurrer was overruled. A trial was subsequently had upon a plea of not guilty, and, a verdict of guilty of murder in the first degree having been found by the jury, the defendant moved the court in arrest of judgment, upon the ground that more than one offense had been charged in the indictment. The motion was denied, and, judgment having been rendered upon the verdict, the case is brought here upon appeal. The statute (Pen. Code, § 954) under which the proceedings in question were had distinctly provides that the indictment 'must charge but one offense,' while it is self-evident that the indictment here, charging the defendant, as it does, with the murder of three persons, necessarily charges three offenses. The slightest examination of the statute upon the part of the district attorney, in the first instance, would have prevented such a blunder. Even if he had overlooked it, however, at the outset, it would seem that the demurrer and motion in arrest of judgment subsequently made ought to have called it to his attention."

If the indictment in this case had alleged that the poison had been administered to all three of the persons killed, by one and the same act, then it would have been good, but, failing to make this appear upon the face of the indictment, it was bad for duplicity.

In another case the same court said:

"The information charges two offenses, for which reason the defendant's demurrer should have been sustained. 'The indictment or information must charge but one offense, but the same offense may be set forth in different forms under different counts, and, when the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count.' Pen. Code, § 954. While under our statute the indictment or information may charge the same offense in different forms under different counts, this must be done in such a way as to show clearly upon the face of the indictment or information that the matters and things set forth in the different counts are descriptive of one

and the same offense. *People v. Thompson,* 28 Cal. 216. In the information before us there is nothing to indicate any connection between the offense charged in the first count and that charged in the second. In the first, the defendant is charged with the crime of assaulting, with intent to kill, Lenora Philis, with a large bar of iron, three feet in length, alleged to be a deadly weapon—the said Lenora then being only three feet distant from him, the said Salvador Garcia.' In the second count, defendant is charged with the crime of assaulting, with intent to kill, the said Lenora, with 'a rifle gun, then and there loaded with gunpowder and leaden ball,' also alleged to be a deadly weapon—the said Lenora then being 'only ten feet from him, the said Garcia, and from said rifle gun aforesaid.' In brief, according to the information, the defendant committed two separate and distinct assaults upon Lenora Philis on the 28th of June, 1881, with intent to murder her—one with a large bar of iron while she was but three feet from him; and the other with a loaded rifle gun, while she was but ten feet distant. Proof of the facts alleged in the second count would not have sustained the averments of the first, nor would proof of the facts alleged in the first count have sustained the averments of the second. 3 Greenleaf on Ev. § 140; 2 Sharswood's Black Com. 194; Wharton's American Law of Homicide, p. 260." (*People v. Garcia,* 58 Cal. 102.)

As we approve the reasoning of the cases above quoted, we will not pursue this question further than to state that selling intoxicating liquor and shipping or conveying such liquor from one place in the state to another place in the state cannot be joined in the same information or indictment. They constitute distinct offenses, based upon separate transactions or acts. The trial court, therefore, erred in not sustaining the objection to the indictment upon the ground of duplicity. To prevent any mistakes in the future in other cases, we will call attention to the further fact that the allegation as to the shipment or conveying of the liquor is defective in not stating the place in this state from which it was so shipped or conveyed, and the place in the state to which it was so shipped or conveyed. This is a descriptive averment which is necessary for the purpose of identifying the transaction and offense.

Third. Defendant's eleventh assignment of error complains

of the action of the trial court in permitting the county attorney in his opening statement to the jury to read the affidavit upon which the information was based. In their brief counsel for the defendant say:

"The complaint was made, subscribed, and sworn to by a negro named Joe Holmes. Holmes was not present at the trial and did not testify in person. The county attorney attempted to and did get before the jury his statements in the complaint as testimony against plaintiff in error. The latter had no opportunity to confront Holmes when testifying, nor did he have the opportunity to cross-examine him."

The record touching this matter is as follows:

"Defendants thereupon were arraigned in open court, and, being forced to plead to the information, pled thereto, 'Not guilty.' The county attorney thereupon read to the jury the complaint of Joe Holmes, the information and amended information, and made a statement of the case to the jury on behalf of the state. The defendants objected to the reading of the said complaint to the jury, which objection the court overruled, and permitted the county attorney to read same to the jury, to which ruling the defendants, including the defendant Norman Sturgis, then and there excepted and still except."

This presents the question as to whether or not it is permissible for the prosecuting attorney, as a part of his opening statement of the case to the jury to read the affidavit upon which the information is founded. Section 5484, Wilson's Rev. & Ann. St. 1903, contains the following:

"(5484) § 348. The jury having been impaneled and sworn, the trial must proceed in the following order: First. If the indictment is a felony the clerk or district attorney must read it, and state the plea of the defendant to the jury. In other cases this formality may be dispensed with. Second. The district attorney, or other counsel for the territory, must open the case and offer the evidence in support of the indictment. Third. The defendant or his counsel may then open his defense, and offer his evidence in support thereof."

Even if it was error to read in the opening statement to the jury the information and the affidavit upon which the information was based, yet as the affidavit in this case is substantially copied

in the information, and as the jury were thereby fully informed of the contents of the affidavit, the error, if any, was harmless and without prejudice to the substantial rights of the defendant. The purpose of the opening statement of the prosecuting attorney is to inform the jury of the nature of the accusation upon which the defendant is being tried, and apprise them of the testimony by which the state seeks to secure a conviction. This statement is made to enable the jury to understand the issues before them and more readily see the relation of each fact relied upon to the issues presented. It is therefore proper to state fully the questions which the jury will be called upon to decide, so that they may start their investigation with clear conception of what is before them. We are not prepared to say that the county attorney cannot read the affidavit upon which the information is based, not as evidence, but as a part of his opening statement, and this is all that the record discloses was done in this case. We must presume that the jury was composed of men of at least ordinary intelligence, and that they knew the difference between an accusation and the evidence by which that accusation must be proven to be true before a 'conviction could be secured. If counsel had entertained any doubt upon this subject, they should have requested an instruction from the court covering the law upon this question.

Fourth. The twelfth assignment of error presents two questions as to the admissibility of evidence: First. As to the circumstances and conditions under which the statements of a conspirator are admissible in evidence against his co-conspirator. Second. As to the circumstances and conditions under which a party can contradict or impeach his own witness. The proper presentation of these questions requires a statement of the evidence admitted upon the trial.

C. E. Page testified that he was a deputy sheriff of Tulsa county, and lived at Broken Arrow; that on the 31st day of December, 1907, he was given a dollar by the sheriff or county attorney, and directed by them to go to a certain corrugated iron roofed building on Boston avenue, near the intersection of First

street, and buy some intoxicating liquors there if he could; that he went to this building directly and purchased from a negro, whom he did not know and could not identify, a pint of whisky, and paid the negro for it the sum of $1. The defendant objected to this testimony because incompetent, irrelevant, and immaterial, but the court overruled his objection, to which he excepted. The witness also testified that he had since been told by other persons and had learned from them that the negro from whom he bought the whisky was Joe Holmes. The defendant objected to this testimony because incompetent, irrelevant, and immaterial and hearsay, but the court overruled his objection, to which he excepted.

A. C. Gilchrist testified that he was then and had been since the 16th day of November, 1907, deputy sheriff of Tulsa county, and that on the 31st day of December, 1907, he had a warrant of arrest for a negro by the name of Joe Holmes, and went to this building on Boston avenue for the purpose of arresting him. In this building he found Joe Holmes with a white apron and sleevelets on, standing behind a home-made counter, in front of which defendant and three other persons were standing. The defendant had a glass containing a small quantity of whisky in his hand, and the others drinking Budweiser beer, while just in front of Joe Holmes on the counter was a pint bottle, containing two or three drinks of whisky. That he did not see Joe Holmes or any one else sell or deliver any liquors of any kind to any one, and he arrested Joe Holmes and took him to county attorney's office. He also testified that about 25 minutes afterwards he returned to the vicinity of this building where he arrested Holmes, and there saw another negro by the name of John McKinley with a sack on his arm pass from one corner of said building across a wagon yard to another building known as the "old stone jail" and enter the latter building by a door which he unlocked with a key. That he followed this negro into this building, and found him engaged in passing bottles of beer from a barrel into the sack he had taken with him. That he found in this "old stone jail" seven full barrels of Budweiser beer, and one barrel about

half empty, on all of which were labels containing the name of A. W. Sturgis. The defendant's name is Norman Sturgis, but the record shows that there was a man living in that community whose name was A. W. Sturgis. That he arrested the negro and took from him the key by which he had gained entrance to the building. This witness also testified that, when he arrested McKinley the latter stated to him that he, McKinley, had been sent from the corrugated iron roofed building across to this "old stone jail" by a man whom he did not know, for the purpose of getting some beer and bringing it back to the first-named building, and that he was in the employment at the time of Mr. Sturgis and Mr. Steen (whether he meant defendant or Arthur Sturgis is not .clear). This witness also testified that on the 26th day of December, 1907, he and the sheriff and some other officers searched the corrugated iron roofed building, under a search warrant, and that on that occasion he found the negro Joe Holmes in the building, dressed in a white jacket and apron; that the building had a home-made counter in the northwest corner, with an ice box behind the counter; that he found in this building on that occasion 28 quarts and 22 pints of whisky, and an unopened barrel of beer, and some other beer in the ice box; and that the sheriff entered the building from the front by breaking in the door.

The county attorney by leave of court, over defendant's objection, introduced one of the barrels found in the "old stone jail" at the time McKinley was arrested, and a few bottles of the beer. The defendant moved the court to exclude from the jury all the testimony of A. C. Gilchrist concerning the search of the corrugated iron roofed building on December 26, 1907, and all his testimony detailing the statement of the negro McKinley made to him when the latter was arrested on December 31, 1907, and all his testimony concerning the beer found in the "old stone jail" on the latter date, and the physical evidence of the empty barrel, and to instruct them not to consider any of said testimony or evidence in rendering their verdict. The court overruled this mo-

tion, and refused to so instruct the jury, to which defendant excepted.

Lon Lewis, on behalf of the state, testified that he was then, and had been since the 16th day of November, 1907, sheriff of Tulsa county, and that on the 26th day of December, 1907, he made a search of the iron roofed building under the authority of a search warrant; that on approaching the building from Boston avenue he saw defendant and Walt Steen come out of the front door of the building, and one of them, but which he did not know, pulled the door to, and, by so doing, locked it; that he asked the defendant to open the door for him, but that he refused, saying that he had nothing to do with the building; that he then broke in the front door and found on the inside of the building the negro Joe Holmes, clothed in white jacket and apron, standing in the northwest corner of the room behind a homemade counter, and several persons whom he did not know standing in front of the counter; that upon a search of the building he found behind the counter an ice box containing about a half barrel of Budweiser beer, and in a secret cut-off in the wall found several quarts of whisky. The defendant objected to all this testimony because incompetent, irrelevant, and immaterial, but the court overruled the same, to which he excepted.

Billy Lane, on behalf of the state, testified that some time in November in the latter part of the month, according to his best recollection, he and Joe Holmes were going down Boston avenue in the city of Tulsa, and met one Walt Steen, who spoke to Joe Holmes and asked him the whereabouts of a certain other negro who had been working for him; and upon Holmes' statement that he did not know where he was Steen said that he would do as well, and that he would just hire him, and that Steen and Holmes left the witness and went across the street to the building on the west side, described as the corrugated iron roofed building on the west side of Boston avenue. That a few days afterwards he went to this building to see Joe Holmes, and found him there at work. That on the occasion when he went to see Joe

Holmes at this building, the defendant Walter Steen was there and admitted him to the building. The defendant objected to the introduction of this testimony because incompetent, irrelevant, and immaterial, but the court overruled the objection, to which he excepted.

John McKinley, on behalf of the state, testified that on the 31st day of December, 1907, he went to the iron roofed building mentioned, for the purpose of securing work there; that Joe Holmes had told him that if he would come around there on that day he thought he could get a job; that he didn't find Joe Holmes there at that time, but some one in the building, whom he did not know, handed him a sack and asked him to go across the wagon yard to the "old stone jail" and to go into that building, and out of an empty barrel which he would find there get six bottles of beer, put them in the sack, and bring them back to him; that he took the sack and went across to the "old stone jail," and, by means of a key which had been given him by the man who sent him, entered it; that he found the barrel referred to, and took one bottle of beer out of it and put it in the sack, and was in the act of passing a second bottle from the barrel into the sack when he was arrested by Deputy Gilchrist; that it was his intention, if he had not been disturbed by the officer, to get the six bottles of beer, and take them back to the man who had sent him. Defendant objected to this testimony because incompetent, irrelevant, and immaterial, but the court overruled his objection, to which he excepted. The witness also testified on direct examination that he did not tell Deputy Gilchrist when he was arrested, or at any other time, that he was working for Sturgis and Steen, or that he was getting $1 per day from them for washing and repacking beer bottles, or that in substance; that he did not tell him that he had been sent for the beer by defendant, or either of the other defendants, or any one else whom he knew. He also testified that on the 31st day of December, 1907, he was not in the employment of defendant or either of the other defendants, and did not even know the defendant or Arthur Sturgis.

The county attorney then asked the witness if he did not say to him in a conversation in the county attorney's office on December 31, 1907, in the presence of Lon Lewis, A. C. Gilchrist, and others, that he was on that day in the employment of Sturgis and Steen, and that he got for his services $1 per day, and that the work he did was to wash empty beer bottles and repack them in barrels. The defendant objected to this question, because incompetent, irrelevant, and immaterial, and tended to impeach the witness, but the court overruled his objection and permitted the witness to answer, to which ruling the defendant excepted. The witness then answered that he did not.

The county attorney, M. A. Breckenridge, then introduced himself as a witness on behalf of the state, to contradict and impeach the witness McKinley, alleging that McKinley had taken him by surprise in testifying that he was not in the employment of defendant and Arthur Sturgis and Walt Steen on December 31, 1907, and did not wash empty beer bottles or repack them in barrels for them, and did not get a dollar a day for his services; and testified that on December 31, 1907, in his office, the witness McKinley stated to him, in the presence of Lon Lewis, and A. C. Gilchrist, and others, that on December 31, 1907, he was working for Sturgis and Steen and got a dollar a day from them for his services, which were to wash empty beer bottles and repack them in barrels. Defendant objected to this testimony because incompetent, irrelevant, and immaterial, and tended to impeach McKinley, but the court overruled his objection, to which he excepted.

By leave of court, counsel for defendant then examined the witness, touching his being taken by surprise, and he stated under this examination that a few days before, on the trial of Walt Steen on this same information, McKinley had testified and had stated on that trial that he was not in the employment of defendant or Arthur Sturgis or Walt Steen on December 31, 1907, and did not wash empty beer bottles or repack them in barrels for them or either of them, and did not get a dollar a day for his services; and that he, McKinley, had denied on that trial that he

made such statements to the county attorney in his office on December 31, 1907, in the presence of Lon Lewis or A. C. Gilchrist, or any one else.

The defendant then moved the court to exclude the testimony of this witness from the jury, and instruct them not to consider it for any purpose; but the court overruled this motion and refused to so exclude said testimony or so instruct the jury, to which ruling defendant excepted. The county attorney then introduced Lon Lewis and A. C. Gilchrist to contradict and impeach McKinley, by testifying that McKinley had said in their presence in the county attorney's office on December 31, 1907, that on that day he was in the employment of Sturgis and Steen, and got a dollar a day for his services washing empty beer bottles and repacking them in barrels. They each so testified, over the objection of defendant, because, incompetent, irrelevant, and immaterial, who saved his exceptions to the court's ruling thereon.

The foregoing is a condensed and accurate statement of all of the evidence introduced by the prosecution against the defendant. There is enough direct evidence in the record to establish the fact that the building where the liquor was found constituted a nuisance as defined by the enforcement act, but the enforcement act had not yet been passed by the Legislature, and therefore has no application to this trial. There is enough circumstantial evidence to support a verdict of guilty against Joe Holmes for selling intoxicating liquor to persons whose names were unknown, but Joe Holmes was not upon trial. There is no evidence of conveying liquor from one place in the state to another place in the state, unless the transfer of one bottle from the barrel to the sack by the witness McKinley would constitute such a conveyance. We hardly think that this can be seriously claimed. There is no evidence that the defendant sold intoxicating liquors, except the statements of the witnesses as to what they heard Joe Holmes and McKinley say. This was hearsay, pure and simple, and was therefore not admissible as evidence unless it can be brought within some of the exceptions to hearsay testimony recognized by law. It was attempted to make

these statements admissible upon the ground that Holmes and McKinley were the agents of the defendant, and the trial court instructed the jury upon the law of master and servant as applicable to civil cases. The principles of law recognized and enforced in civil cases as to agency are not and never have been a part of criminal jurisprudence. There is no such thing as an agent in a criminal case as is enforced in civil cases.

Section 1948, Wilson's Rev. & Ann. St. 1903, is as follows:

"(1948) § 27. All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

This statute abolishes all of the distinctions of the common law in criminal cases as to accessories before the fact, and as to principals in the first degree and second degree. All such persons stand before the law upon an equal footing, and must be indicted or prosecuted by information, tried, and convicted as principals.

Sections 1949 and 1950, Wilson's Rev. & Ann. St. 1903, are as follows:

"(1949) § 28. All persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony, and with intent that he may avoid escape from arrest, trial, conviction, or punishment, are accessories.

"(1950) § 29. In misdemeanor, there are no accessories."

If Holmes and McKinley were concerned with the defendant in the commission of the offense charged in the information, then all were principals, and anything said or done by either of them in pursuance of the common design to commit the offense would be competent evidence not only against the person making such statement or doing such act, but also against the other defendants concerned in the commission of the offense. This would be true as long as said parties were concerned with each other in the commission of the offense, but it would not include any acts done or statements made after the completion of the offense, unless the person against whom it was offered in evidence was present and saw or heard the act done or the statement made, and assented

thereto or acquiesced therein. This is the extent and the limit of the law upon this subject. In order to render such evidence competent, it is not necessary to prove beyond a reasonable doubt that such persons were acting together or concerned in the commission of the offense charged. Slight evidence that the witness and the defendant were acting together or concerned in the commission of the offense is all that is required. This has been decided by the Supreme Court of Oklahoma Territory, and also by this court. *Wells v. Territory*, 14 Okla. 445, 78 Pac. 124; *Perkins v. Territory*, 10 Okla. 518, 63 Pac. 860.

In the case of *Price v. State*, 1 Okla. Cr. 358, 98 Pac. 456, this court said:

"Sixth. Defendant complains of the action of the court in refusing to allow proof of threats made against him by Jim Parks when the deceased was not present. This evidence was offered on the theory that Parks and deceased were acting together. The trial court held that there was no evidence in the record of such acting together, and that therefore threats made by Parks, not in the presence and hearing of deceased, were not admissible. We do not desire to be understood as expressing any opinion as to the weight of the evidence or the credibility of the witnesses, but we cannot agree with the trial court in saying that there is no testimony in this record tending to show that these parties were acting together in this matter. As to what credence the jury should give to this evidence is not for this court to say. It is enough for us to know that there is some evidence in the record to this effect. In 2 Wharton on Evidence, § 1205, we find the following: 'When a conspiracy is shown to exist, which is usually inductively from circumstances, then the declarations of one conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all.' See, also, *Phillips v. State*, 6 Tex. App. 380; *Hannon v. State*, 5 Tex. App. 549."

In the case of *Devore v. Territory of Oklahoma*, 2 Okla. 565, 37 Pac. 1092, it was held that such evidence might be introduced

2 Cr.—25

before there was any evidence of such acting together by the defendant and the persons whose acts and statements were so admitted in evidence, upon the promise of the county attorney that such acting together will subsequently be shown.

To prevent what we conceive to be questionable practice, in the future we would advise the trial courts against pursuing this course. The safe rule is to require some evidence of such acting together before the acts and declarations of others concerned in the commission of an offense are admitted in evidence, when such acts were not committed or statements were not made in the presence of the defendant.

Under these rules of law the question now presents itself as to whether there is in the record any evidence that the defendant was concerned with Holmes and McKinley in the sale of intoxicating liquor, except the testimony as to the statements of Holmes and McKinley to the witnesses who testified to such statements. C. E. Page, the first witness, did not even mention the defendant, directly or indirectly. A. C. Gilchrist did not testify to a single fact within his own knowledge which even remotely connected the defendant with the commission of the offense. Lon Lewis testified that he saw the defendant come out of the door of the building in which the liquor was sold, and that the defendant then told him that he (defendant) had nothing to do with the building. Billy Lane did not even mention the defendant's name. John McKinley, a state's witness, did not in his testimony in any manner involve the defendant in this transaction. There is not one word of evidence in this record, except hearsay, which proves or tends to prove that the defendant was concerned with Holmes or McKinley in the sale of intoxicating liquors. Until some evidence had been introduced to this effect, it was error for the trial court to allow the state to introduce the hearsay statements made by Holmes and McKinley.

The twelfth assignment of error also assails the question of the manner in which a party may contradict or impeach his own

witness. John McKinley was placed on the witness stand by the state, and his testimony in no manner connected the defendant with the commission of the offense charged. He also testified on direct examination that he did not tell Deputy Gilchrist when he was arrested, or at any other time, that he was working for Sturgis and Steen, or that he was getting $1 per day from them for washing and repacking beer bottles, or that in substance; that he did not tell him that he had been sent for the beer by plaintiff in error or either of the other defendants, or any one else whom he knew. He also testified that on the 31st day of December, 1907, he was not in the employment of defendant or either of the other defendants, and did not even know defendant or Arthur Sturgis.

The county attorney then asked the witness if he did not say to him in a conversation in the county attorney's office on December 31, 1907, in the presence of Lon Lewis, A. C. Gilchrist, and others that he was on that day in the employment of Sturgis and Steen, and that he got for his services $1 per day, and that the work he did was to wash empty beer bottles and repack them in barrels. The defendant objected to this question because incompetent, irrelevant, and immaterial, and tending to impeach the witness, but the court overruled his objection and permitted the witness to answer, to which ruling the defendant excepted. The witness then answered that he did not. It should be remembered that this alleged conversation took place after the completion of the offense and was not in the presence of the defendant. The county attorney, M. A. Breckinridge, then introduced himself as a witness on behalf of the state to contradict and impeach the witness McKinley, alleging that McKinley had taken him by surprise in testifying that he was not in the employment of defendant and Arthur Sturgis and Walt Steen on December 31, 1907, and did not wash empty beer bottles or repack them in barrels for them, and did not get a dollar a day for his services, and testified that on December 31, 1907, in his office, the witness McKinley stated to him, in the presence of Lon Lewis and A. C. Gilchrist and others, that on December 31, 1907, he was working for Sturgis

and Steen and got a dollar a day from them for his services, which were to wash empty beer bottles and repack them in barrels. Defendant objected to this testimony, because incompetent, irrelevant, and immaterial, and tending to impeach McKinley, but the court overruled his objection, to which he excepted.

By leave of court, counsel for defendant then examined the witness touching his being taken by surprise, and he stated under this examination that a few days before, on the trial of Walt Steen on this same information, McKinley had testified and had stated on that trial that he was not in the employment of defendant or Arthur Sturgis or Walt Steen on December 31, 1907, and did not wash empty beer bottles or repack them in barrels for them or either of them, and did not get a dollar a day for his services; and that he had denied on that trial that he made such statements to the county attorney in his office on December 31, 1907, in the presence of Lon Lewis or A. C. Gilchrist, or any one else.

The defendant then moved the court to exclude the testimony of this witness from the jury, and instruct them not to consider it for any purpose; but the court overruled this motion, and refused to so exclude said testimony or so instruct the jury, to which ruling defendant excepted.

The county attorney then introduced Lon Lewis and A. C. Gilchrist to contradict and impeach McKinley by testifying that McKinley had said in their presence in the county attorney's office on December 31, 1907, that on that day he was in the employment of Sturgis and Steen, and got a dollar a day for his services washing empty beer bottles and repacking them in barrels. They each so testified over the objection of defendant, because incompetent, irrelevant, and immaterial, who saved his exception to the court's ruling thereon.

Was the introduction of this impeaching testimony proper? Originally the law was that, when a party voluntarily introduced a witness in proof of his case, he thereby represented him as

worthy of belief. The parties were presumed to know the character of the witnesses they produced and the facts to which they would testify, and, having thus presented them, the law would not permit the party afterwards to impeach them. All of the earlier decisions are to this effect, and some later authorities still adhere to this rule. But law, while conservative, is a progressive science, and keeps even step with the progress of mental development, and adapts itself to the changing conditions among men in their relations to each other, and the requirements of justice owing to these changes. If it were not for this, the world would be ruled by the dead and not by the living. The former rule is that of China; the latter rule is that of America.

So the ancient rule prohibiting a party from impeaching his own witness has been modified in those particulars wherein experience and reason have shown it to be unjust. A party cannot now impeach his own witness by proving the bad character of such witness for truth, because this is something of which the party can and should inform himself before placing a witness upon the stand. But suppose a witness makes a statement to a party which would be highly beneficial to such party, and the party, thus having reasonable ground to believe that the testimony of the witness would be in substance the same as the statement made, in good faith places the witness upon the stand, and the witness, instead of swearing to the statement previously made, testifies to matters which are injurious to the party calling him, it would be a manifest perversion of justice to say that the party so surprised, deceived, and imposed upon is bound by such testimony. Under these conditions the great weight of modern authority is that a party, upon grounds of surprise at and injury from the testimony so given, may, in the discretion of the trial court, offer in evidence previous statements of such witness which contradict the injurious portions of his testimony. This rule is necessary for the protection of litigants against the contrivance of artful and designing witnesses. If a witness had deceived the party cal-

ling him (to the injury of such party), it would be manifestly unjust to hold the party to be bound by such deception and to prevent him from relieving himself of such injury. This is the philosophy of the law, upon which parties are permitted to offer contradictory statements made by their witnesses, for the purpose of impeaching them.

But this rule is subject to certain conditions: First. The party must be surprised at the testimony of the witness sought to be so impeached, and this surprise must exist as a matter of fact; that is, it must be based upon such facts as would give the party reasonable ground to believe that the witness would testify favorably to such party. If the facts were such that the party had no reasonable ground to believe, when he placed such witness on the stand, that the witness would so testify, then no surprise could exist at the failure of the witness to give such testimony, and statements previously made by the witness, contradicting the testimony given, would not be admissible. Second. It is not enough that the witness failed to testify favorably to the party calling him, in order that previous contradictory statements made by such witness may be introduced in evidence, but the witness must have testified to facts injurious to the party calling him before he can be so impeached. In other words, such contradictory statements are permissible alone for the purpose of impeaching the witness, and are not original substantive evidence against the adverse party. Third. When such contradictory statements are admitted in evidence, under proper conditions, the court should clearly inform the jury that such contradictory statements can only be considered by them for the purpose of affecting the credibility of the witness, and that it is for the jury alone to determine whether they do have this effect or not, and that such contradictory statements are in no sense to be considered as original evidence against the adverse party.

In the case at bar there is no testimony in the record that the county attorney had reasonable ground for surprise at the testimony of the witness McKinley. This witness had testified on

the trial of Steen, only a few days prior to this trial, substantially as he testified in this case. This put the county attorney upon notice of what he would swear. With a full knowledge of this fact, the county attorney placed McKinley on the stand as a witness for the state. He is therefore not in a position to claim surprise. He made no showing that anything had occurred since the Steen trial which gave him the least right to expect that the testimony of McKinley would in this case be different from the testimony which he gave in the Steen trial. The testimony of the county attorney entirely shuts out the idea of surprise. Again, when McKinley was examined in chief by the county attorney, and before the effort to impeach him had been made, the witness had not stated a single fact favorable to the defendant or anything inconsistent with the testimony of the other witnesses for the state. His evidence was negative, and he only failed to swear what the county attorney desired him to testify to. Under these conditions, the statements made by the witness out of court, injurious to defendant, were not admissible in evidence, because he had not testified to a single fact which injured the state's case.

The defendant requested the court to instruct the jury that they would consider said testimony for no other purpose than that of impeaching or contradicting, if it in any wise did impeach or contradict, the witness John McKinley. The court overruled this motion and refused to so instruct the jury. This was error. If this testimony was competent at all, it was competent for no other purpose than that of impeaching and contradicting McKinley, and the court should have so instructed the jury. Who can say but that the jury did not consider this testimony as original substantive evidence, showing that McKinley and the defendant were connected or acting together in committing the acts charged in the information? They would be warranted in so considering it after the court had refused in their presence to limit the scope to that of impeaching and contradicting McKinley.

The restrictions, above stated, upon the right of a party to

impeach his own witness by showing contradictory statements made by such witness, are supported by the soundest reasons, and are based upon the highest considerations of public policy. If the state has the right, upon the plea of impeaching its own witness, to introduce statements made by such witness contradictory of his testimony given in court, and thus get hearsay before the jury, as original substantive evidence against a defendant, then in all fairness and justice we would be compelled to hold that the defendant had the same right. The far-reaching and ruinous consequences of such a rule are manifest. A defendant could place a witness upon the stand and, after asking him a few general questions, could then ask the witness if he had not made a statement (giving the statement in full) to the defendant, and other persons, which would constitute a complete defense. Upon the denial of the witness that he had made such a statement, the defendant could then place the parties named upon the witness stand and prove that the first witness had made such statements. If a defendant could do as was permitted to be done by the state in this case, it would be impossible to secure a single conviction, and no one would be subject to the pains and penalties of perjury. There are already too many loopholes for the escape of the guilty. This court will not add to or enlarge these avenues of escape; on the contrary, it is our purpose to close them up as far as possible.

For the reasons hereinbefore given, the court erred in permitting the state to introduce evidence to impeach its own witness McKinley, and erred again in refusing to give the instruction requested by the defendant with reference to such evidence. We are supported in this view by many eminent authorities and well-reasoned cases.

The Supreme Court of Missouri in the case of *Dunn v. Dunnaker,* 87 Mo. 600, said:

"A party introducing a witness, and thereby vouching for his veracity, cannot impeach his testimony, either by general evidence showing his bad character for truth, or by evidence of statements

made by him· out of court contradictory ́of his testimony ́at the trial. 1 Greenleaf's Evid. § 442. Proof of such contradictory statements could not be allowed as evidence of their truth, and could therefore be offered or received for no other purpose than to destroy the credit of the witness. Authorities to the contrary may be found, but we are of the opinion that, unless the party is entrapped into offering as a witness one who testifies contrary to what he, or others upon whom the party had a right to rely, assured him his testimony would be, the evidence of contradictory statements made by him is not admissible. 1 Greenleaf's Evid. § 444. No such element of surprise or imposition exists in this case."

The Court of Criminal Appeals of Texas, in the case of *Gibson v. State*, 29 S. W. 471, said:

"The state sought to prove its case by Mrs. Frances Martin, mother of said Dora Martin, and failed. Over appellant's objection, the state was permitted to prove by the witness Smith that, when he summoned Mrs. Martin as a witness, she began to cry, and said to him, '1 have tried to ́get Joe Gibson to marry Dora, and stop all this trouble, and he won't do it;' that 'she asked me to talk to defendant, and try to get him to marry Dora.' The rule upon this subject is as follows, to wit: ' *   *   * A party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony ·in any other manner, except by proving the bad character of the witness.' Code Cr. Proc. art. 755. In this case Mrs. Martin testified to no fact injurious to the state, but simply failed to make out the state's case. The object of Smith's testimony was to discredit Mrs. Martin, and show in this manner defendant's guilt. This was improper, and not permissible. The judgment is reversed, and cause remanded."

The Ohio court, in *Insurance Co. v. Schmidt*, 8 Am. Law Rec. 629, said:

"A party cannot impeach his own witness on the ground of surprise if the witness does not come up to his expectations, but does not testify adversely."

The Supreme Court of Indiana in the case of *Blough et al. v. Parry et al.*, 144 Ind. 468, 469, 40 N. E. 72, said:

"Where a witness does not testify to anything prejudicial to

the party calling him, there can be no object in impeaching him. * * * Such testimony, though not beneficial, is not prejudicial, and, therefore, no reason exists for impeaching the witness. The witness, Emma Norris, did not testify to the facts sought to be proven by her, and therefore no right arises to impeach her for her failure to testify to such facts."

The Supreme Court of Georgia, in the case of *McDaniels v. State of Georgia,* 53 Ga. 254, 255, said:

"A party shall not be permitted to discredit his own witness, unless he first shows to the court that he has been entrapped by previous contradictory statements made by the witness. It is not sufficient that he shall have made contradictory statements; such statements must have deceived, and led the party complaining to introduce him, and thus unwittingly to have been damaged by statements different from what he expected. Under such circumstances, the law permits a party to violate that salutary rule which assumes that one who brings a witness before a court has, at least, confidence in his truthfulness. In this case no effort was made to show to the court an entrapping; it does not even appear that the solicitor general knew what he had stated, or that he had ever talked with the witness, much less that he had put him up as a witness by virtue of any false impression."

The Texas Court of Appeals, in *White v. State,* 10 Tex. App. 395-398, said:

"As to the right of a party to impeach his own witness, Mr. Wharton says (1 Wharton's Law of Evidence, § 549): 'By a technical rule of the English common law, while a party may contradict his own witnesses, though this may discredit them, he is not ordinarily permitted to impeach them, even though called afterwards by the opposite side, either by general evidence, or by proof of prior contradictory statements. By calling the witness, so it is argued, a party represents him to the court as worthy of credit, or at least not so infamous as to be wholly unworthy of it; and, if he afterwards attack his general character for veracity, that is not only *mala fides* towards the tribunal, but it "would enable the party to destroy the witness if he spoke for him, with the means in his hands of destroying his credit if he spoke against him." In this country, while a party cannot ordinarily discredit his own witness, his right to prove a case inconsistent with that stated by such witness is unquestioned, even though this discredits

the witness incidentally. We have also held that, even at common law, adverse witnesses who tell a story contradicting that which they had previously given may, on the party calling them being thus surprised, be examined as to their former statements in all cases where it would appear that a deception has been practiced on the party examining, and that he has been guilty of no negligence or laches. In England, the right to ask as to such former statements has been much agitated, though the weight of authority, at common law, is against the right so to impeach, unless with the limitation just expressed. On the other hand, it is urged "that, although a party who calls a person of bad character as a witness, knowing him to be such, ought not to be allowed to defeat his testimony because it turns out unfavorable to him, by direct proof of general bad character," yet it is only just that he should be permitted to show, if he can, that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial; that this course is necessary as a security against the contrivance of an artful witness, who otherwise might recommend himself to a party by the promise of favorable evidence (being really in the interest of the opposite party), and afterwards by hostile evidence ruin his cause; that the rule, with the above exception as to offering contradictory evidence, ought to be the same whether the witness is called by one party or the other, and that the danger of the jury's treating the contradictory matter as substantive testimony is the same in both cases; that, as to the supposed danger of collusion, it is extremely improbable, and would be easily detected. It may be further remarked that this is a question in which not only the interests of litigating parties are involved, but also the more important general interests of truth in criminal as well as civil proceedings; that the ends of justice are best attained by allowing free and ample scope for scrutinizing evidence and estimating its real value; and that in the administration of criminal justice, more especially, the exclusion of proof of contrary statements might be attended with the worst consequences. So far, however, as concerns impeaching witnesses generally, this view does not obtain. But a party *bona fide* surprised at the unexpected testimony of his witness may be permitted to interrogate the witness as to his previous declarations alleged to have been made by the latter, inconsistent with his testimony, the object being to probe the witness' recollection, and to lead him, if mistaken,

to review what he has said. Such corrective testimony, also, is receivable to explain the attitude of the party calling the witness. But when the sole object of the testimony so offered is to discredit the witness, it will not be received.'

"We have copied the entire paragraph of Mr. Wharton as embracing an epitome of the general rules of the common law as well as the exceptions and modifications to general rules on the subject under consideration. Besides these common-law rules, we have a special provision of the Code of Criminal Procedure, which, to the extent to which it applies, is the rule of law governing the question; when it does not apply, as there is no other statutory provision on the subject, the common-law rules apply. The article of the Code is as follows: 'The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness.' Code Cr. Proc. art. 755. To our minds, it being shown that the state's witnesses had testified on a former trial, the state had a right to suppose they would swear to the same facts on the present trial, and, they having failed to do so, it was competent for counsel representing the state to inquire of the witnesses as to what different facts they had testified to, or what contradictory statements they had made on the former trial, for the purpose of showing surprise at the testimony, or for the purpose of probing the recollection of the witnesses and to refresh their memory. * * *

"The fault, however, in the proceeding as we find it set out, consists in the fact that it does not appear what object counsel had in view in making the inquiry of the witnesses with reference to their testimony in the previous trial, and the further fact that it does not appear that any steps whatever were taken to guard the jury against taking the supposed contradictory statements made on the former trial then being had before the court and jury, which should have been done, and a failure to exercise this precaution was likely to have resulted prejudicially to the defendant then on trial."

The Texas Court of Appeals, in *Bennett v. State,* 24 Tex. App. p. 77, 5 S. W. 528, 5 Am. St. Rep. 875, said:

"By the bill of exceptions in this case it is shown that the prosecution had placed one Hardy Kyle on the stand as a wit-

ness for the state, and on his direct examination he stated: 'I never heard defendant say anything about the Sparks yearling.' This is in full all the statement made by him.. Does it appear that this statement was injurious to the state or any one else? If so, then any negative answer to a question propounded where an affirmative was desired, and *vice versa*, might be claimed to be injurious. After the witness had so stated, over objection of defendant the court permitted the prosecution, with avowed purpose, to first lay a predicate, and then introduce evidence to impeach its witness by proving that said witness had on another occasion stated to counsel for prosecution 'that defendant had tried to hire him (witness) to go before the grand jury and testify for him in this case, and that he had offered to hire him to testify before the jury, and that he was so drunk when before the grand jury that he did not know what he then swore.' In our opinion, a proper and sufficient case in which the impeachment of one's own witness would be allowable is not established by the facts shown. A case of surprise at testimony other than that expected and calculated upon is perhaps shown. But there is a well-defined difference in the rules with reference to surprise and impeachment. 'A party *bona fide* surprised at the unexpected testimony of his witness may be permitted to interrogate the witness as to his previous declarations alleged to have been made by the latter, inconsistent with his testimony, the object being to probe the witness' recollection and lead him, if mistaken, to review what he has said. Such corrective testimony is also receivable to explain the attitude of the party calling the witness. But when the sole object of the testimony so offered is to discredit the witness, it will not be received.' The ruling complained of was erroneous and it can be readily imagined how the testimony admitted to impeach the state's witness, Kyle. even had it been pertinent to the issue raised, which is not made apparent, was most prejudicial to the rights of this appellant."

For the purpose of refreshing the memory of a witness, in a proper case, he may be asked as to statements made upon other occasions, even though he may not have stated in his testimony facts injurious to the party calling him. This is also true as to witnesses which a party may be forced, on account of some statutory provision, to place upon the stand. But evidence of statements

made on other occasions contradictory of his evidence given in court cannot be introduced by the party calling the witness, unless the witness has stated facts in his testimony which are injurious to such party, and the party has reasonable ground to be surprised thereby.

Under the twentieth assignment counsel also complain of the action of the court in permitting the introduction of a barrel and some bottles of beer, found in the place where McKinley was arrested. If it had been shown that the defendant was connected with or in possession of this place, the introduction of this evidence would have been proper. *Reed v. Territory,* 1 Okla. Cr. 481, 98 Pac. 583; *Lightle v. State, ante,* p. 334, 101 Pac. 608. But as there is no legal evidence in the record that the defendant was in possession of this place, or in any manner connected with it, the admission in evidence of the empty barrel and the bottles of beer for the inspection of the jury was erroneous.

Fifth. The thirteenth assignment of error was waived. The 14th, 15th, 16th, 17th, 18th, 19th, 20th, and 21st assignments of error relate to matters which are involved in the 12th assignment, and are fully discussed under that head. Therefore, further discussion as to those matters is unnecessary.

The twenty-second assignment is as follows:

"In the course of his argument to the jury, the county attorney made reference to the fact that plaintiff in error (defendant) had failed to testify in his own behalf. His statement was that he did not intend to make any reference to the fact that defendants failed to testify in their own behalf, for the reason that, if he did, it would be reversible error. The plaintiff in error (defendant) objected to this statement, and saved his exceptions thereto."

Counsel for a defendant must not only object to improper statements of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were of such a character that the error would not be cured by a withdrawal of the remarks. Ordinarily

an objection is simply a protest against a certain line of argument. If the matter is deemed to be of sufficient importance to call for a review by this court, a motion to exclude should be made, and, if overruled, an exception should be saved, and the question then comes properly before us for discussion, except as to remarks which are of such a character that their effect cannot be avoided by the withdrawal of the remarks from the jury. This presents two questions for decision: First. Were the remarks of the county attorney improper? Second. Are they of such character that their injurious effects could not be cured by their withdrawal? Under our statute we are compelled to answer both of these questions in the affirmative. Section 5494, Wilson's Rev. & Ann. St. 1903, is as follows:

"(5494) § 358. In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offenses and misdemeanors before any court or committing magistrate in this territory, the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him nor be mentioned on the trial; if commented upon by counsel it shall be ground for a new trial."

In construing this statute, the Supreme Court of Oklahoma Territory, in the case of *Wilson v. Territory*, 9 Okla. 338, 60 Pac. 113, said:

"We think that this provision of our Criminal Code is mandatory, and leaves no discretion in the trial court to refuse to grant a new trial upon the application of the defendant. Neither do we think that such highly prejudicial remarks by the prosecuting officer can be cured or remedied by the withdrawal of the statements from the consideration of the jury by the court and admonishing them that they must not consider the same. *State v. Boyd*, 5 Kan. App. 802, 48 Pac. 998; *State v. Tennison*, 42 Kan. 332, 22 Pac. 429; *State v. Balch*, 31 Kan. 465, 2 Pac. 609."

In *State v. Balch*, Mr. Justice Valentine, in delivering the opinion of the court, said:

"Nor can the principle be tolerated that convictions for violated law may be procured or brought about by the inauguration

and accomplishment of other violations of the law. It is also true that in this case the court below instructed the jury that the statement made by the county attorney should not be allowed to work any prejudice to the rights or interest of the defendant. But, under the authorities, the evil done by such an infringment of the law—an infringement of the law by the prosecuting officer of the state—cannot be remedied or cured by any mere instruction of the court. The only complete remedy, if the defendant is convicted, is to grant a new trial on his motion. Of course, if he does not want a new trial, or does not make a motion therefor. he should be sentenced. The judgment of the district court is therefore reversed, and the cause remanded with direction to grant a new trial."

This question again came before the same court in the case of *Perkins v. Territory,* 17 Okla. 84, 87 Pac. 297, and the court then said:

"Where a defendant fails to offer any evidence, the prosecution is not prevented from discussing the evidence against him, and to insist that such evidence is undisputed: but a prosecuting officer under the statute must refrain from calling attention of the jury to the fact that a defendant has failed to testify in his own behalf. *Wilson v. Territory,* 9 Okla. 331, 60 Pac. 112. For the reason stated, the case is hereby reversed, and a new trial granted at the cost of the territory."

The Supreme Court of Indiana, in *Long v. State,* 56 Ind. 182, 26 Am. Rep. 19, said:

"An allusion by counsel for the state in a criminal prosecution, made during his argument of the cause before the jury, to the fact that the defendant had failed to testify as a witness on the trial of such cause, is sufficient ground for a new trial, and is not cured by the facts that the court admonished the counsel that such allusion was improper, and instructed the jury that no attention should be paid by them to the same."

In the opinion it is said:

"We construe the statute to mean that, when a defendant in a criminal cause declines to testify in his own behalf, absolute silence on the subject is enjoined on counsel in their argument on the trial. *    *    *."

The Supreme Court of Illinois, in *Baker v. People,* 105 Ill. 452, said:

"The statute has in unmistakable terms, declared, in effect, the omission of the accused to testify shall not be used to his prejudice or taken as an evidence of guilt, and in such case court and counsel should studiously avoid all allusions to the subject."

Mr. Wharton, in his work on Criminal Evidence (9th Ed.) § 435a, states the law as follows:

"By some statutes counsel are prohibited from making any argument or comment on the silence of the defendant; and in such jurisdictions, if the counsel for the prosecution call attention to such silence, this is ground for new trial, even though counsel at the time is checked by the court. And new trials will be granted, even in states where counsel are not so prohibited, if the court permits such comments, in the face of objections from the defense."

The Court of Criminal Appeals of Texas, in the case of *Brazell v. State,* 33 Tex. Cr. R. 333, 26 S. W. 723, said:

"In the opening argument, counsel for the state said: 'We have proved where the defendant was on the 29th, 30th, and 31st of January, 1893, and we have shown by the witness Forrester that the defendant was present and committed this burglary'; and then, facing the defendant, said: 'Now, where does he say he was if he was not there?' On objection being made, the court admonished the counsel not to refer to that, and told the jury not to consider it. It seems from this that the trial judge understood the counsel to be referring to the fact that defendant had the opportunity to testify with regard to this matter, and had not availed himself of the privilege. We think the remarks bear this construction, and under repeated decisions the allusion is cause for reversal; and the fact that the court rebuked them, and withdrew them from the consideration of the jury, does not cure the vice."

These cases were all decided upon statutes similar to ours, and present our views upon this question. If the defendant fails to avail himself of the privilege granted by the statute, of becoming a witness in his own behalf, this fact must not be mentioned upon the trial, or in any manner referred to by the prosecuting

2 Cr.—26

attorney. If the jury inquire of the court as to the effect of the failure of the defendant to testify in his own behalf, the court should instruct them that no inference of guilt can arise from such failure, and that it cannot be lawfully considered or discussed by them or in any manner influence their action in arriving at a verdict. The statute is mandatory, and, when it is violated either in its letter or its spirit, a new trial must be granted, or upon appeal a reversal will follow. The trial court, therefore, erred in not granting a new trial on account of the fact that the county attorney in his argument, called the attention of the jury to the fact that the defendant had failed to testify in his own behalf. If counsel for the defense in any manner refer to the failure of the defendant to take the witness stand, the court should at once intervene and rebuke such attempt, and see that it is not repeated.

Sixth. The twenty-third assignment of error has been waived. The twenty-fourth assignment of error complains that the court gave verbal instructions to the jury without the consent and over the objections of the defendant. It appears in the record that, after the jury had been out some time considering their verdict, they returned into court, and the foreman, in the presence of the rest of the jury, asked the court if they could find one defendant guilty on one count, and the other one guilty on the other count, and disagree as to the guilt of one of the defendants on the first count and the other defendant on the second count. The jury had previously come from their consultation room into court and propounded to the court this written interrogatory: "Does the jury have to take as conclusive evidence that which has been introduced and not denied on rebuttal?" The defendant had at that time requested the court to answer the question in a written instruction, but the court then refused to do so, merely stating verbally, over defendant's objection, that they would find the answer to their question in instruction No. 4, theretofore given. When the jury appeared for the second time and asked the court the question first above referred to, the defendant interposed an objection to any

further instructions from the court; but the court overruled his objection, and told the jury verbally "that, if Richard Roe and John Doe were being tried on two counts in the same information, the jury might return findings that they had agreed as to one count and disagreed as to the other count, with reference to one defendant, or *vice versa,* or that defendants might be found guilty on one count and not guilty on the other, or that the jury might agree as to one or more counts as to one or both of the defendants, and disagree as to one or more counts with reference to one or both defendants."

In subsection 6, § 5484, Wilson's Rev. & Ann. St. 1903, will be found the following:

"All instructions given shall be in writing unless waived by both parties, and shall be filed and become a part of the record in the case."

A similar case to the one now under consideration is presented in *Boggs v. United States,* 10 Okla. 424, 63 Pac. 969, 65 Pac. 927. The record in that case presents the following facts:

"The jury, not having agreed upon a verdict, were by the order of court brought into court, all parties being present, and the following communications passed between the court and jury:

"Q. The Court: 'Gentlemen, have you agreed upon a verdict?' A. By the Foreman: 'No sir; we have not.' Q. The Court: 'Do not state how you stand at all; but I want to ask you a few questions. What seems to be the trouble? Do you not understand the instructions, or is it a difference as to the facts and the evidence?' A. Foreman: 'I am unable to say.' Q. The Court: 'What do you say—the next juror?' A. 'I think the difference is in regard to the evidence.' Q. The Court: 'Do all the rest of you agree that that is the trouble?' A. 'Yes, sir.' Q. The Court: 'Well, is there a difference as to what the facts are, or as to what the evidence that was introduced establishes?' A. Juror: 'Yes, sir, as to what the evidence establishes.' Q. The Court: 'There does not seem to be any difference as to what the evidence really is?' A. 'No, sir.' Q. The Court: 'But the difference is as to what it proves?' All answer in the affirmative. Q. The Court: 'What do you think the possibilities are for arriving at a verdict from further deliberations?' A. By

Juryman: 'It seems like it was a pretty poor chance to me.' Q. The Court: 'What do the rest of you gentlemen think?' A. Jurors: 'We think it is almost impossible.' Q. The Court: 'You have considered every phase of it that would enable you to arrive at a verdict?' All answer in the affirmative. The Court: 'I hardly feel justified, gentlemen, in discharging you at this time; I think I will direct you to return to your room and consider the matter further. Of course it is not the intention or desire of the court to keep you out to compel you to arrive at a verdict—nothing of the kind; all the court wants. and all the law requires, is that you give this matter your honest, candid, careful consideration, and if you can arrive at a verdict honestly and conscientiously and correctly, as you view the evidence in the case of course it is your duty to do it; but you should not sacrifice your own views if you believe them to be correct, simply for the purpose of arriving at a verdict; that you ought not to do; but it is your duty to consider the evidence, talk it over, and arrive at a verdict if you can conscientiously.' A. Juror: 'I would like to ask if we would be allowed to bring in a verdict different from any of these forms that we have?' The Court: 'If you desire to submit— Of course, I don't know what kind of a verdict you could possibly bring in other than one of these that were submitted; there is just the one issue that is before you—as to whether or not this defendant is guilty. That is the only question. If you will read the instructions as to this particular point, I think they are plain. If he concealed or secreted, embezzled or destroyed, if he did any one of these, why, he is guilty, or if he did all of these he is guilty; there would be no difference in the crime at all. I cannot conceive of any other verdict that should be returned, except guilty or not guilty of some one of the offenses or that offense. Do you mean by a different verdict one that does not include all of the counts in the indictment?' Juror: 'Yes, sir.' The Court: 'You can return a verdict on any one of the counts, or on any number of them, or all of them.' By a Juror: 'I will ask you a question: I do not know whether it will be right or not. There are some of these charges that this jury, none of us understand the penalty to. That seems to be the trouble.' The Court: 'Gentlemen, in that connection the court will instruct you that you absolutely have nothing to do with the penalty that is attached to a crime; that you are not to determine. No matter how wise or unwise our legislators may have

been, they took that out of your province to say as to what punishment should be inflicted upon a party when found guilty; the issue that is submitted to you, and the only issue for you to determine, is as to whether or not he is guilty of this charge, and you have no right to take into consideration the punishment that might be inflicted. You are to try and determine the truth of this charge, not as to how much he might be punished if he is found guilty.'

"To all of the remarks of the court defendants excepted, for the reason that the same were not in writing. The jury then retired, and afterwards, on the same day, the jury returned the following verdict: 'We, the jury, impaneled and sworn in the above-entitled cause, do on our oaths find the defendant, George G. Boggs, guilty of secreting letters containing inclosures as charged in the third, fifth, sixth, and seventh counts of the indictment. G. F. Price, foreman.'

"Were the remarks of the court to the jury an instruction within the meaning of the statute, which requires all instructions to be in writing? This brings us to a consideration of the meaning of an instruction as defined by the courts and law writers. In the case of *Lehman v. Hawks et al.*, 121 Ind. 541, 23 N. E. 670, the Indiana Supreme Court defines an instruction to be: 'An exposition of the principles of law applicable to a case or some branch or phase of a case, which the jury are bound to apply in order to render a verdict establishing the rights of the parties in accordance with the facts proven.'

"The same court, in the case of *Lawler v. McPheeters*, 73 Ind. 577, says: 'Instructions proper are directions in reference to the law of the case.'

"Bouvier, in his Law Dictionary, gives this definition of the word 'charge,' which in our law is synonymous with 'instruction': 'Charging a jury is stating the precise principles of law applicable to the case immediately in question.'

"In the case of *McCallister v. Mount*, 73 Ind. 567, the court says: 'The essential idea of a charge is that it is authoritative as an exposition of the law, which the jury are bound by their oath and by moral obligation to obey.'

"In *Bradway et al. v. Waddell et al.*, 95 Ind. 175, it is said: 'A direction to the jury to reject evidence, as to the form of verdict, or the like, is not an instruction within the meaning of the statute.' In support of this, they there cite with approval *Mc-*

*Callister v. Mount,* 73 Ind. 567; *Lawler v. McPheeters,* 73 Ind. 577; *Stanley v. Sutherland,* 54 Ind. 339; *Trentman v. Wiley,* 85 Ind. 33.

"The distinguished and learned author of our splendid work on Pleading and Practice, after carefully compiling the most reliable definitions of the term 'charge' or 'instruction,' and after a careful and painstaking investigation of the subject, as a general, careful, and accurate definition of the term, uses the following clear, concise, and unmistakable language: 'In conclusion, it may be stated that nothing short of a positive direction as to the law applicable to the case will be construed an instruction within the meaning of the statute.' Book 11, p. 259, Encyclopedia of Pleading and Practice.

"In this connection it may be well to consider some of the oral remarks by the court to the jury which the courts have held not to be an instruction within the meaning of the statute requiring all instructions to be reduced to writing. The language of the Indiana statute in reference to written instructions is: 'When the arguments of the cause are concluded, the court should give general instructions to the jury which shall be in writing, and be numbered and signed by the judge, if required by either party.'

"In the case of *Stanley v. Sutherland,* 54 Ind. 339, the trial judge said orally to the jury, speaking of some of the defendant's evidence: 'Gentlemen of the jury, I instruct you that this evidence will have no bearing on the case unless the plaintiff is connected with it in some way, or the fact brought to the knowledge of the plaintiff.' Held, that this statement did not constitute an instruction within the meaning of the statute. The Supreme Court said: 'Literally the word "instruction" may apply to any direction given by the court to the jury, but as used in the statute, making it incumbent on the court to reduce its instructions to writing, it relates to the law of the case, and may properly be said to mean an exposition of the principles of law applicable to a case or some branch or phase of a case which the jury are bound to apply in order to render a verdict establishing the rights of the parties in accordance with the facts proven.'

"The language of the Michigan statute on this subject is as follows: 'The court shall in no case orally qualify, modify or in any manner explain the written charge.'

"In the case of *O'Donnell v. Segar,* 25 Mich. 379, the trial

judge made this oral statement to the jury in explanation of his written charge: 'The bringing of a suit for exempt property, or claiming it was exempt, was justified by law, and must be so regarded by the jury as well as by the court.' To which remark the defendant objected and excepted. Held not to be error. The Supreme Court say: 'We can readily see that this was the expression of a mere legal truism, which could not and did not modify the effect of any of the written charges given, and consequently cannot be treated as error.'

"In Colorado the language of the statute is: 'The instruction shall be reduced to writing, and may be taken by the jury on their retirement and returned by them with their verdict.'

"In the case of *Strepey v. Stark et al.*, 7 Colo. 623, 5 Pac. 111, after the jury had been out a considerable time, without agreeing upon a verdict, the trial judge called them in and addressed them orally at length, calling their attention to the disastrous effect to litigants, and the hardships to the public, on account of the failure of juries to agree upon a verdict at the end of protracted litigation, calling the attention of the jury to the fact that this was the third trial of the present case, and it was the desire of the court to secure a verdict if it was within the bounds of possibility, at the same time telling them that his remarks were not intended and should not be understood or construed in any other way than to impress upon the minds of the jury the importance of an agreement. Held not to be error.

"In California the statute reads: 'In no case shall any charge or instruction be given the jury otherwise than in writing unless by the mutual consent of the parties.'

"In the case of *People v. Jackson*, 57 Cal. 316, after deliberating for a considerable time, without arriving at a verdict, the jury came into court and asked the question: 'What is the least punishment for the crime of grand larceny?' The trial judge answered: 'You have nothing to do with the punishment.' Held proper and no error.

"In Missouri the statute provides: 'In no original case shall the court give to the jury any charge or instruction on any question of law or fact, except the same be in writing, and filed in the case, and if any court shall violate the statute the party may except and the judgment shall be reversed.'

"In *State v. Good*, 132 Mo. 127, 33 S. W. 790, the trial judge said orally to the jury: 'I caution you, gentlemen, to dis-

tinguish between questions asked by counsel, and the answer excluded by the court, and the matters testified to on the stand by the permission of the court.' Held not to be error, as not being an instruction within the meaning of the statute.

"In the case of *Hasbrouck v. City of Milwaukee,* 21 Wis. 217, the trial judge prefaced his written charge with oral remarks as follows: 'During the long and fatiguing trial the court may have become impatient at the delays of counsel, and made remarks that may have possibly influenced some juror. I wish it specifically understood that nothing I have said was intended to influence unduly the verdict of the jury, and I do not wish any juror to be influenced in the least by it. In submitting this case to you I will not comment at all upon the evidence, leaving you to weigh it all in your own judgment, and bring in your verdict accordingly.' Held not to be error.

"In the case of *Millard v. Lyons,* 25 Wis. 516, a juror, after reading the written charge, asked 'whether the plaintiff had a right to use the defendant's divided grain to feed the stock and sheep?' The trial judge answered, orally, 'He would not have the right by law.' This was held no part of the charge, the Supreme Court saying: 'The question might have been answered by the simple word "No," and that it would be nonsense to require the court to write the word and then read it to the jury.'

"In *Grant v. Insurance Company,* 29 Wis. 125, the trial court said to the jury: 'The defendant has offered no evidence to sustain the issues he has presented, and, the plaintiff's proof being conclusive, you must find a verdict for the plaintiff.' This was held no violation of the statute.

"In the case of *State v. Jones,* 7 Nev. 409, which was a trial for larceny, the trial judge made oral remarks to the jury as follows: 'The court is not desirous of punishing the jury, but as it is a great expense to the county, and a venire of seventy-five jurors has already been exhausted, and this trial has taken a great deal of time already, and it is very doubtful if another jury can be got in this county to try this man, I will give you an instruction upon the point on which you were in doubt last night, and it may aid you to make up a verdict.' He then read over one of the instructions included in the written charge. In passing upon this assignment of error, the court, speaking through Justice Lewis, says: 'It was not a statement of the law governing the case, nor an instruction in any manner directing the jury how

to find a verdict; it is in no sense a charge; the law of the case had been previously given to them, and they were fully aware of the gravity of the duty imposed upon them. Clearly the immediate tendency of the remarks was simply to induce a more careful and anxious consideration of the case, to let the jury understand that they should make an effort to agree upon a verdict, simply, but not contrary to the evidence, law, or rights of the defendants. No such conclusions can properly be drawn from the remarks, nor would it be warranted when taken in connection with the written instructions given, wherein the rights of the defendant are fully guarded. It is true such remarks had better not be made, but still, in this case, we are unable to see that the defendants could have been prejudiced by what was said.'

"We cite the foregoing cases and the remarks made by the trial courts and the holding of different courts thereon to illustrate the truth of what has been said so well by Justice Brewer in the case of *State v. Potter*, 15 Kan. 320: 'The mere fact that an oral communication has passed from the court to the jury is not of itself proof that the statute has been disregarded, but the court may properly make oral statements to the jury in reference to the form of the verdict, the manner in which the trial has been conducted, the behavior of the jury or counsel or parties, or any other oral statement which is not fairly and strictly a direction or instruction upon some question or rule of law involved in or applicable to the trial or a comment upon the evidence.'

"Now we are aware that this authority is one cited by counsel for plaintiff in error to sustain the position taken by them, but we think a careful analysis of it, and a candid comparison with the case at bar, will show that it not only fails to sustain the contention of appellant, but does tend to sustain the position we have taken, to wit, that the oral remarks made by the trial judge in the case at bar were not an instruction or charge to the jury within the meaning of the statute. Now let us for a moment compare the two cases. They were both criminal cases, the Kansas case being a charge of murder, the statutes of Kansas and Oklahoma being practically the same. The language used by the trial judge in that case was as follows: 'I mean by that, that makes him principal and not accessory; there is no such thing in my judgment as accessory in this case. These acts make him principal, and should be regarded by you as principal and not accessory. He is either principal or nothing.'

"The Kansas statute is: 'The judge must charge the jury in writing, and the charge shall be filed among the papers of the case.' Gen. St. p. 858 (Cr. Code, § 236).

"The Kansas Supreme Court held that this language was not an instruction or a charge within the meaning of this statute. Observe the similarity of language to the case at bar. The Kansas judge said: 'These acts make him principal and not accessory, and should be regarded by you as principal and not accessory. He is principal or nothing.'

"The trial judge in the case at bar said: 'If you will read the instructions, I think they are plain; if he concealed or secreted, embezzled or destroyed, if he did any one of these, why, he is guilty, or if he did all of them he is guilty.'

"It certainly seems to us that the language used in the Kansas case was much stronger and much more in the nature of an instruction, for in that case the judge says: 'Those acts make him principal,' thereby making a positive statement of what the evidence established, thus drawing an absolute conclusion from the evidence and stating it to the jury, while in the case at bar the judge simply says, if such and such things are established, he is guilty, giving no indication as to the opinion of the court on the subject of whether or not such facts have been proven. Then, again, the remarks of the judge on that occasion should be taken as a whole. Isolated portions should not be separated out and conclusions drawn from part alone, unconnected with other parts of the remarks. We can only get the true meaning and a correct and intelligent understanding of the effect of the remarks upon the jury by examining them as a whole. It seems to us that the entire conversation between the court and the jury is qualified, and its meaning and understanding modified by the remark: 'If you will read the instructions of the court, I think they are plain.' This was the key by which the language then being used by the court was to be understood and interpreted by the jury. He said: 'If you will read the instructions of the court, I think they are plain; if he concealed, secreted, embezzled, or destroyed, he is guilty.' In what way are they plain? Why, they are plain that you are instructed by them that, if he concealed, secreted, embezzled, or destroyed, he is guilty. The court was making no direct statement, but was simply referring to the instructions previously given, and this was in answer to the question: 'Can we render a verdict different to the form furnished us?' We think

the reasoning of Judge Brewer in the Kansas case will apply with equal force to this case. He says: 'It may be remarked that the purpose of this statute is to secure to the defendant the exact rulings of the court in order that he may avail himself of any errors in the rulings. That it was not intended to cast any unnecessary burdens upon the court, or to hamper and restrict communications between the court and jury. That it should be so construed as fairly to secure that purpose, and not to be made a mere weapon of technical error. That in answer to questions, as there is nothing to require the questions to be reduced to writing before they are put, it would seem trifling to compel the answer to be so reduced, when the answer is simply responsive to, and depends for its meaning upon, the unwritten question.'

"It seems to us that, tested by this last rule, the oral statement in this case must be held not to violate the statute, and no grounds for reversal. Many words are used, but after all it amounts to no more than a negative reply to the question asked, to wit, 'If a party could be an accessory,' the court's reply was: 'There is no such thing as an accessory; the party is principal or nothing.'

"In the case at bar the court said the party is guilty or not guilty; if he did these things, he is guilty. In the Kansas case, the judge said: 'These acts make him principal.' In this case the judge said, if he did these things he is guilty. There certainly can be no dispute over the fact that the language used by the judge in the Kansas case is more objectionable than the case at bar, yet the Kansas Supreme Court said such statements were not an instruction, within the meaning of the statute. This was a construction put upon the Kansas statute by the Supreme Court of that state, which statute is practically the same as ours.

"It will be seen that, in the remarks of the trial judge to the jury, no independent proposition of law was given, no comment on the evidence was made, the whole tenor of the conversation was as to the form of a verdict the jury could return. The remarks of the court were all directed to the answer to the inquiry, as to whether they could return a verdict different from the forms furnished, and was all in explanation as to the form of verdict they might or ought to return. And, as to all questions of law, he refers the jury to the written instructions previously given, with the remark, 'I think they are plain.' It is our duty to pre-

sume that the jury were men of reason and of ordinary intelligence, and that they were capable of understanding ordinary, plain English language; and, this being so, when the court said to them, 'If you will read the instructions, I think they are plain,' it will not be presumed that they understood that the remarks were to be taken as a new or different statement of the law than that contained in the written charge, but they would certainly understand that he was referring them for the law of the case to the written instructions. We take the rule to be well settled that an oral direction to the jury as to the form or character of the verdict they may return is not such an instruction as is contemplated by the statute requiring all instructions to be in writing, and we think, when the record is fairly examined and the remarks of the court properly and correctly construed in the light of the interrogatory of the juror to which they were an answer, they clearly fall within this class.

"As the record shows that the jury were fairly and fully instructed as to the law of the case, in the written charge of the court, we are unable to see how the rights of the defendant have been jeopardized or his interests unfavorably affected by the remarks of the court to the jury; and by the Statutes of Oklahoma of 1893, § 5330, Criminal Procedure, it is made the duty of this court on appeal to give judgment without regard to technical errors or defects, and not to consider exceptions which do not affect the substantial rights of the parties; and as, on an examination of the entire record, we are unable to see how these remarks of the court could in any way have prejudiced or affected the rights of the defendant, this assignment of error cannot be sustained, as we take the rule to be well established that, when a statute in express and unequivocal terms declares that judgment shall be given without respect to error or objection that does not affect the substantial rights of the parties, it must be made to appear to the court that the substantial rights of the complaining party were unduly prejudiced before the judgment will be reversed."

We have quoted thus extensively from the able opinion of Judge Irwin, in the Boggs Case, because we regard it as an admirable and exhaustive statement of the law upon this question. This case was approved by this court in *Douglas v. Territory,* 1 Okla. Cr. 583, 98 Pac. 1023, in which a similar question was passed upon. These decisions may be accepted by the profession as the

settled policy of this court. We therefore hold that the trial court in this case did not commit error in the remarks complained of.

The twenty-fifth assignment of error has been waived. The twenty-sixth assignment of error relates to the action of the court in overruling defendant's motion for a new trial. As all of the questions presented to us contained in the motion for a new trial have been passed upon, we will not repeat what we have hereinbefore said.

For the errors pointed out, the conviction is reversed and the cause remanded.

Reversed and remanded.

BAKER and DOYLE, JUDGES, concur.